SAUER INCORPORATED, Appellant,

v.

Richard J. DANZIG, Secretary
of the Navy, Appellee.

No. 99–1206.

United States Court of Appeals,
Federal Circuit.

July 20, 2000.

Kent P. Smith, Smith & Fleming, of Atlanta, Georgia, argued for appellant. With him on the brief was James W. Copeland.

Michael F. Kiely, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for appellee. With him on the brief were David W. Ogden, Acting Assistant Attorney General; David M. Cohen, Director; and Harold D. Lester, Jr., Assistant Director.

Before NEWMAN, MICHEL, and BRYSON, Circuit Judges.

BRYSON, Circuit Judge.

Sauer Inc. appeals the decision of the Armed Services Board of Contract Appeals denying its request for an equitable adjustment of a construction contract and for remission of liquidated damages imposed under the contract. We affirm the Board's ruling as to all but one of the issues Sauer raises on appeal. On the remaining issue of Sauer's entitlement to an adjustment for labor and equipment inefficiencies, we vacate and remand for further proceedings.

## I

### A

In February 1986, the government and Sauer entered into a fixed-price construction contract (the RIF Contract) for the completion of the interior of the Refit Industrial Facility (RIF) building at the Navy's Kings Bay, Georgia, submarine base. Another contractor had constructed the shell of the building, and Sauer was to complete the inside wall and ceiling construction, build the concrete floor, and do the mechanical, electrical, plumbing, and

painting work. The RIF Contract required work to commence on March 15, 1986, and to conclude by March 15, 1987. Liquidated damages for late completion were set at $1725 per day.

The contract contained the standard Federal Acquisition Regulation provision regarding other contracts being performed at or near the worksite, *see* 48 C.F.R. § 52.236–8, as well as other provisions relating to concurrent contractor activity at the work site. For example, the specification invited the contractor's attention "to the fact that other contractors may be engaged in similar and supporting work requiring close cooperation" and required the contractor to "cooperate and schedule his work to avoid conflict with and interruption of the work of others insofar as practicable." The specification identified other work that could be under way during the performance of Sauer's contract, including contracts to install cranes inside the RIF. With respect to the crane contracts, the specification required that "[a]ccess to the building must be provided to the crane contractor throughout the construction period." An installation schedule detailed when various phases of the crane construction were planned, including the rail work and the bridge, trolley, and electrical work on the cranes.

### B

Although the contract's crane-installation schedule indicated that all of the rail work would be completed by the end of 1986, the crane contractors had made very little progress by that time. Sauer's contract manager on the site notified the Navy at that time that Sauer would require an equitable adjustment of the contract to include additional costs and an extension of time because of the presence of crane contractors in the RIF during Sauer's finish work. An internal Navy memorandum generated following Sauer's request for an adjustment took the position that the contract schedule for crane installation was not binding on the government, because the contract secured access to the RIF for crane contractors through-

out Sauer's performance period. In addition, the memorandum concluded that the interference between Sauer and the crane contractors would be minimal and that the concurrent work should not cause any delays to Sauer's performance if Sauer cooperated with the crane contractors.

The Navy's project engineer adopted the conclusions of the memorandum in his response to Sauer's request. He instructed Sauer to adhere to its current schedule "as if no crane installations were planned" and noted that the crane contractors would be responsible for whatever damage they caused. The response also indicated that the previous absence of crane contractors in the RIF "should be considered a benefit" because Sauer had "not had to cooperate and coordinate with another extra contractor in the building" during the early stages of contract performance.

Sauer disagreed with the project engineer. Although Sauer acknowledged that the crane contractors needed to have access to the RIF throughout the contract period, it stated that it had assumed the government would adhere to the crane construction schedule and not allow that schedule to fall behind. Moreover, Sauer took the position that the contractual provision allowing the crane contractors access to the RIF did not give them unfettered freedom to work when and where they chose. Sauer maintained that interference costs, resulting from the out-of-sequence work that Sauer was required to do, were chargeable to the government.

The crane work inside the RIF began in early March 1987 and continued through the end of September 1987. During that period, two contractors were installing cranes, a third was correcting crane-rail work that a previous contractor had done improperly, and several other contractors were performing other work inside the facility. Sauer continued to complain to the Navy about interference, and the Navy continued to deny that the concurrent work of the other contractors was having any undue impact on Sauer's performance.

In May 1987, the Navy notified Sauer that it planned to store a large crane in the RIF. Sauer responded by informing the Navy of the location within the building where the stored crane would cause the least interference with Sauer's work. The Navy acknowledged Sauer's communication and referred Sauer to the changes clause in the contract regarding any equitable adjustment that Sauer considered due because of the presence of the crane. Sauer suggested modifying the contract to add $12,673 and a six-day extension for the interference caused by the crane storage. The Navy offered an increase of $1547 and a one-day concurrent time extension as compensation to Sauer for the storage of the crane, but Sauer declined the offer and reserved its claim.

In July and September of 1987, Sauer took numerous photographs and prepared a videotape to show the conditions in the RIF. The photographs show other contractors working, other contractors' equipment occupying space, and crane rails being stored. According to a Sauer employee, the exhibits document "difficult working conditions."

Several contract modifications extended the contract completion date. The Board identified eight modifications that were issued between February 26 and July 22, 1987, the work for which was done between May 4 and September 10, 1987. Those modifications extended the contract completion date from April 4 to June 1, 1987.

Sauer failed to complete its performance by June 1, 1987, the modified completion date, but it continued to perform. Liquidated damages accrued at the contract-specified rate until June 10, 1987, when the Navy took possession of 20% of the RIF. From that date, liquidated damages accrued at 80% of the contract-specified rate. On July 17, 1987, the Navy occupied the entire facility and ceased assessing liquidated damages. The total of liquidated damages assessed between June 1 and July 17 was $66,585.

At the end of July 1987, the Navy sent Sauer a punch list of more than 2000 items that remained to be completed. A number of disputes between Sauer and the government arose during Sauer's work on the punch-list items. Ultimately, the Navy ordered Sauer off the site and exercised its rights under the contract's inspection-of-construction clause to engage another contractor and complete the punch-list work at Sauer's expense.

### C

Before the Board of Contract Appeals, Sauer sought damages attributable to government-caused delay and disruption, and it sought remission of the liquidated damages assessed by the government. With respect to the delay and disruption claim, Sauer argued that the schedule for crane construction was binding on the government. Sauer contended that it had planned its performance around the crane construction schedule so that it would not be performing finish work concurrently with the crane-rail installation, which it considered to pose a greater potential for interference than the bridge, trolley, and electrical work. When the crane work fell behind schedule, Sauer was forced to perform its finish work concurrently with the crane-rail installation, which Sauer claimed disrupted its performance and caused delay and inefficiency. Sauer also contended that it was entitled to recover its overhead costs for the period of delay.

Sauer vice president Neil Wickersty prepared the delay and disruption claim. Although he had assisted in preparing the RIF Contract bid, he had spent little time at the site during performance and lacked first-hand knowledge of events there. Three Sauer construction-site employees assisted Mr. Wickersty in computing the inefficiency caused by the out-of-sequence crane installation work. Together, the four Sauer employees consulted a bulletin published by the Mechanical Contractors Association of America that estimated the efficiency loss associated with various fac-

tors in minor, average, and severe situations. Ultimately, Mr. Wickersty and the other Sauer employees concluded that government-caused delay and disruption had impacted Sauer's efficiency by factors of 6% to 60%, depending on the particular period of performance.

Robert Rodgers, an expert in critical-path-management analysis, submitted a report and testified for Sauer before the Board. He based his report on the schedule-analysis reports, referred to as I–J reports, that Sauer prepared throughout the contract performance period.

Mr. Rodgers interpreted the I–J reports to indicate that Sauer was essentially on time as of February 24, 1987, which represented the time when interference from other contractors allegedly started to become serious. From February 24 on, Mr. Rodgers allocated responsibility for schedule slippage as follows. First, he counted the number of days in each monthly period. Second, he determined the number of days the estimated completion date had slipped during each period by comparing the estimated completion date shown in the I–J report at the end of the period with the estimated completion date shown in the I–J report at the beginning of the period. He deemed the slippage in the estimated completion date to represent delay in contract performance. Third, he applied Sauer's estimate of the efficiency loss to the period of delay calculated in the second step, unless Sauer's estimate had to be reduced to prevent the calculated government-caused delay from exceeding the actual delay. Finally, he allocated the delay days in the period to government-caused delay and to Sauer-caused delay based on the result of the third step.

For example, the period of April 24 to May 27, 1987, contained 24 workdays. The beginning I–J report for that period estimated completion on July 22, which slipped nine workdays to August 4 on the ending report. For the first 13 workdays, Sauer had estimated an inefficiency factor of 30%, so Mr. Rodgers attributed four workdays of delay to the government for

that period. For the remaining 11 workdays, Sauer had estimated an inefficiency factor of 40%, so for that period Mr. Rodgers attributed four workdays of delay to the government. Thus, of the nine-workday slippage in the project during that period, Mr. Rodgers concluded that eight were attributable to the government and one to Sauer.

Mr. Rodgers's analysis proceeded in that manner for the remainder of Sauer's performance subsequent to February 24, 1987. He concluded that the total delay during that period was 120 calendar days, of which the government was responsible for 72 and Sauer was responsible for 48.

The government countered by asserting that Sauer's case failed for want of proof. In addition to putting on witnesses who denied that there was any undue interference with Sauer's performance, the government introduced testimony and a report from its own expert. The government's expert contended that Sauer was responsible for all delays in excess of the 76 calendar days allowed by contract modifications.

The Board consolidated Sauer's claims for remission of liquidated damages and for delay and disruption and held a hearing on the issue of entitlement. The Board rejected all of Sauer's arguments and proofs except for the ones relating to the crane storage. For the crane storage, the Board granted a contract extension for two days of delay, which it found to be concurrent with other Sauer-caused delays, and it granted a commensurate remission of liquidated damages.

On appeal to this court, Sauer asserts that the crane construction schedule in the contract was a specific contractual representation that it was entitled to rely upon, and that the delay and disruption in Sauer's work caused by the crane-rail installation therefore should have been charged against the government. In addition, Sauer claims that the need for correction work on the crane rails resulted from defective government plans, and that the

government is responsible for all harm flowing from the crane rail work for that reason as well. Accordingly, Sauer asks the court to overturn the Board's decision on the delay and disruption issues except for the imposition of four days of liquidated damages at 80%, which the Rodgers report acknowledged to be proper.

## II

With respect to the delay claim, the Board concluded that Sauer had met its burden of showing excusable delay only with respect to the delay associated with the crane storage. For that delay, the Board concluded that Sauer was entitled to a two-day extension of the contract completion date, but it found that the delay was concurrent with other Sauer-caused delays.

In concluding that Sauer's proof of excusable delay with respect to the remainder of its delay claim was deficient, the Board first explained that it found unpersuasive the testimony of Mr. Wickersty, who prepared the claim. Because Mr. Wickersty had little first-hand knowledge of events at the job site, the Board found that he was "unable to establish with some specificity causal relationships between events on the job and delays in contract completion."

The Board was also unpersuaded by the testimony of other Sauer employees who were involved in determining the inefficiency factors. The Board noted that their testimony, along with the photographs and videotape offered as supporting exhibits, focused on the period after the modified contract completion date. For that reason, the Board considered their testimony not to be probative on the issue of excusable delay.

Finally, the Board found Mr. Rodgers's report and testimony unpersuasive. The Board explained that although Mr. Rodgers asserted that Sauer was "essentially on time" as of February 24, 1987, a proper analysis of Sauer's data showed that Sauer was 70 days behind at that point. The Board found that the discrepancy was traceable in part to Mr. Rodgers's assumption that the work on several of the contract modifications had been completed by February 24, 1987, when in fact it had not.

Sauer argues that the Board misunderstood Mr. Rodgers's analysis by focusing on whether Sauer was on time or behind schedule as of February 24, 1987. In addition, Sauer relies on the Board's general findings that the activities involved in crane installation can interfere with finishing work and that crane-related work was going on in the RIF through September 1987. Those findings, Sauer argues, undermine the Board's conclusion that the crane work in the RIF did not result in compensable delay.

To establish entitlement to an extension based on excusable delay, Sauer must show that the delay resulted from "unforeseeable causes beyond the control and without the fault or negligence of the Contractor." 48 C.F.R. § 52.249–10(b)(1); see *International Elecs. Corp. v. United States*, 227 Ct.Cl. 208, 646 F.2d 496, 510 (1981) ("To avail itself of the excusable delay provision, plaintiff has the burden of proving that the excuse was beyond its control and without its fault or negligence. Plaintiff must further prove that it took reasonable action to perform the contract notwithstanding the occurrence of such excuse."). In addition, the unforeseeable cause must delay the overall contract completion; *i.e.*, it must affect the critical path of performance. See RIF Contract § 01311, pt. 2.4; *Mel Williamson, Inc. v. United States*, 229 Ct.Cl. 846, 850–51 (1982) (contractor failed to establish that the unforeseeable event "caused delay in the overall contract performance").

Substantial evidence supports the Board's finding that Sauer failed to demonstrate excusable delay. First, the Board disregarded the testimony of the Sauer construction-site employees and the exhibits associated with their testimony because that evidence concerned conditions after the contract completion date. In this ap-

peal, Sauer has not challenged the legal premise on which that finding rests, so we accept the Board's rejection of that evidence.

Second, Sauer places more weight on the Board's findings regarding the potential for interference between the crane-rail work and Sauer's finish work than those findings will bear. The Board recognized that the crane-rail work could interfere with finish work and that the crane contractors were in the facility past the time stated in the contract schedule. The Board noted, however, that Sauer's "contemporaneous letters of complaint make no mention of difficulties encountered specific to crane rail work." Also, in light of evidence that Sauer originally had planned to do some finish work when crane-bridge work was scheduled to occur, the Board found that "installation of crane bridges is similar in impact on other work in the area to installation of crane rails." Thus, while the Board recognized the potential for delaying interference from the crane work, it found that Sauer did not meet its burden of showing that such delay actually occurred in this case.

Third, the Board explained why it found Mr. Wickersty's testimony unpersuasive, and Sauer has not undermined the Board's conclusion in that regard. Mr. Wickersty's lack of personal knowledge of events at the job site was undoubtedly a relevant factor for the Board to consider. In addition, when asked how he could relate a particular instance of interference to impact on Sauer's work, Mr. Wickersty testified as follows:

[L]et me explain . . . what my dilemma was. When we submitted this claim, we had all these facts, they [the other contractors] were like mosquitoes flying around the [RIF] for four to five, six months. And I said to myself, how do I quantify this in terms of a time extension? And I came to the conclusion, it can't be done. It was like, the project is just about over, we're out there scrambling around like a circus. How do you translate that into a CPM [critical-path-management] evaluation which is a re-

quirement of the contract? I stated in my claim it's a waste of time. I am not a CPM expert.

Mr. Wickersty thus essentially conceded that he could not establish Sauer's entitlement to an extension based on excusable delay. Instead, he testified that Mr. Rodgers would provide the evidence supporting Sauer's delay claim.

Finally, we cannot say that the Board erred in rejecting Mr. Rodgers's report and testimony. Sauer contends that the Board misunderstood the logic of Mr. Rodgers's analysis when it stated that he "premised the conclusions of his report on [Sauer's] performance being on schedule" on February 24, 1987. Sauer argues that it is irrelevant whether Sauer was on time on February 24, 1987, because Mr. Rodgers's analysis focused on delays caused after that date, when the crane construction work was allegedly interfering with Sauer's performance.

Mr. Rodgers's conclusion that Sauer was on time as of February 24, 1987, is relevant because Sauer's entitlement to an extension depends in part on whether the delay in Sauer's performance of the RIF Contract occurred mainly before or after the crane construction began in early 1987. Mr. Rodgers's analysis led him to conclude that Sauer was essentially on time as of February 24, 1987, and that all of the 120 days of delay in contract performance occurred after that date. The Board, however, concluded that Sauer was 70 days behind schedule as of February 24, 1987. The Board's conclusion on that issue, which is supported by substantial evidence, undermines Mr. Rodgers's conclusion that all 120 days of total delay on the contract were attributable to the post-February period. If that conclusion falls, so does Mr. Rodgers's conclusion that the government was responsible for 72 days of delay during the period that the crane contractors were on the site.

The Board found that Mr. Rodgers's report lacked probative value as a result of "the flaw inherent in its starting point,"

and that his opinion that Sauer was delayed by the government was based on an analysis "too flawed to be convincing." Although Sauer contends that the Board misunderstood Mr. Rodgers's methodology, we see no indication that the Board was confused about the way Mr. Rodgers reached his conclusion. The Board's rejection of Mr. Rodgers's evidence as "unreliable" was within its competence as the finder of fact. Accordingly, we reject Sauer's contention that the government was responsible for 72 days of delay and affirm the Board's finding that Sauer was entitled to only a two-day extension due to excusable delay associated with the crane storage.

### III

Because the Board found only two days of excusable delay, it remitted only two days of liquidated damages. Sauer contends that the Board should have recognized its right to a longer period of excusable delay and therefore should have remitted a much larger portion of the liquidated damages that the Navy assessed against it.

■ As a general rule, a party asserting that liquidated damages were improperly assessed bears the burden of showing the extent of the excusable delay to which it is entitled. *See Dean Constr. Co. v. United States,* 188 Ct.Cl. 62, 411 F.2d 1238, 1240–41 (1969) (affirming a Board finding that a contractor had failed to meet its burden); *Northern Va. Elec. Co. v. United States,* 230 Ct. Cl. 722, 723 (1982); *Central Ohio Bldg. Co.,* PSBCA No. 2742, 92–1 B.C.A. (CCH) ¶ 24,399, at 121,824 (Aug. 30, 1991). We have affirmed the Board's finding that Sauer proved only two days of excusable delay. As a result, Sauer has not shown that it is entitled to a remission of liquidated damages greater than the remission already granted by the Board.

Sauer cites two of this court's cases for the proposition that it was the Navy's burden to establish that Sauer was responsible for the delay in performance, but those cases are inapposite. In both *William F.*

*Klingensmith, Inc. v. United States,* 731 F.2d 805 (Fed.Cir.1984), and *Blinderman Construction Co. v. United States,* 695 F.2d 552 (Fed.Cir.1982), the government's fault for delays had been established, and the court applied the rule that "[w]here both parties contribute to a delay neither can recover damage, unless there is in the proof a clear apportionment of the delay and the expense attributable to each party." *Coath & Goss, Inc. v. United States,* 101 Ct.Cl. 702, 714–15 (1944); *see Klingensmith,* 731 F.2d at 809; *Blinderman,* 695 F.2d at 559. In this case, the Board found that Sauer failed to show more than two days of government-caused delay; those cases are therefore inapplicable.

### IV

■ The Board also denied Sauer's claim for so-called *Eichleay* damages, *i.e.,* the unabsorbed overhead costs attributable to government-caused delay. The Board found that the two-day delay resulting from storage of the crane was concurrent with Sauer-caused delays and that Sauer was not in standby status during the delay. Either of those findings is sufficient to preclude recovery of *Eichleay* damages for that period.

According to Sauer, the Board erred because Sauer was required to show only a delay or suspension of contract performance for a period of uncertain duration during which it was required to remain ready to perform. Sauer argues that it met that burden by (1) producing Navy correspondence indicating that the crane storage was of uncertain duration; and (2) showing that it continued to perform during that period because the Navy did not suspend its performance. Moreover, Sauer asserts that the evidence does not support the Board's finding that the two-day delay was concurrent.

The government responds by pointing out that Sauer bore the "burden of separating the effects of concurrent delays from the effect of alleged Government delays," citing *Klingensmith* and *Blinder-*

*man.* Sauer failed to meet that burden, according to the government. In addition, the government continues, Sauer cannot establish that it was on standby due to the crane storage without showing that the delay had an impact on overall project completion.

■■ We agree with the Board and the government that Sauer has failed to establish its entitlement to *Eichleay* damages. Before a contractor can recover *Eichleay* damages, it must show that a government-imposed delay occurred, that the contractor was required to stand by during the delay, and that while standing by it was unable to take on additional work. *See, e.g., Satellite Elec. Co. v. Dalton,* 105 F.3d 1418, 1421 (Fed.Cir.1997). Sauer has not demonstrated a government-imposed delay, *i.e.,* a compensable delay, *see C.B.C. Enters., Inc. v. United States,* 978 F.2d 669, 673 (Fed.Cir.1992). In order to establish a compensable delay, a contractor must separate government-caused delays from its own delays. *See, e.g., T. Brown Constructors, Inc. v. Peña,* 132 F.3d 724, 734–35 (Fed.Cir.1997); *Commerce Int'l Co. v. United States,* 167 Ct.Cl. 529, 338 F.2d 81, 89–90 (1964) (applying "the rule that there can be no recovery where the [government's] delay is concurrent or intertwined with other delays").

It was Sauer's burden to establish that the two-day delay was caused by the government and was not concurrent with delay caused by Sauer. Sauer has cited no evidence supporting its contention that the crane-storage delay was nonconcurrent. Therefore, we affirm the Board's denial of *Eichleay* damages.

### V

■ Sauer's request for an equitable adjustment of the RIF Contract included a claim for damages due to labor and equipment inefficiencies, *i.e.,* for disruption. The Board, however, never squarely addressed Sauer's disruption claim. The Board stated that "[t]o succeed with a delay and disruption claim ..., a contractor must establish that overall contract completion was excusably delayed." Consequently, Sauer's failure to prove excusable delay doomed its disruption claim under the rule stated by the Board.

Sauer contends that the legal standard applied by the Board is erroneous and that the evidence it introduced establishes its entitlement to compensation for disruption. In response, the government argues that Sauer's disruption claim fails for lack of proof and contends that the Board "did not reject Sauer's disruption claim solely upon the basis that Sauer failed to prove impact upon the overall completion date of the project."

■ We agree with Sauer that it need not establish delay to overall contract completion to succeed on its disruption claim. The changes clause in the RIF Contract provides for an equitable adjustment if any change "causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed." 48 C.F.R. § 52.243–4 (1986). Consequently, if the Navy's failure to follow the crane-installation schedule provided in the RIF Contract can properly be considered a change or a constructive change—a matter not decided by the Board—then any increased costs flowing directly and necessarily from that change would be compensable. *See, e.g., Electronic & Missile Facilities, Inc. v. United States,* 189 Ct.Cl. 237, 416 F.2d 1345, 1361 (1969); *Paul Hardeman, Inc. v. United States,* 186 Ct.Cl. 743, 406 F.2d 1357, 1361–63 (1969) (noting that the allowable equitable adjustment is "the difference between what it cost [the contractor] to do the work and what it would have cost [the contractor] if the unforeseen conditions had not been encountered" (internal quotation omitted)).

The Court of Claims considered a case similar to this one in *Electronic & Missile Facilities, Inc. v. United States,* 189 Ct.Cl. 237, 416 F.2d 1345, 1359–61 (1969). In that case, the contractor submitted a loss-of-efficiency claim for rescheduled and out-

of-sequence work that was required by a constructive change imposed by the contracting officer. Even though delay was not an issue in the loss-of-efficiency claim, the court held that the contractor was entitled to "an equitable adjustment to cover increased costs which were the direct and necessary result of the change or changed conditions, where the condition or the change directly leads to disruption, extra work, or new procedures." *Id.* at 1361.

We cannot conclude with certainty that the Board would have denied Sauer's disruption claim if it had applied the correct legal standard. We note that the Navy's assertion that the disruption claim fails for want of proof is not completely unfounded, as many of the Board's comments on the evidence are equally applicable to disruption as to delay. But the Board's legal error may have infected its factual inquiry and conclusions, particularly with respect to evidence that the Board rejected as not bearing on the delay question. Focusing entirely on the issue of delay, the Board did not address the question whether, apart from any government-caused delay, Sauer suffered damages attributable to the presence of the crane contractors, and whether any such damages were compensable under the contract. We therefore vacate the Board's decision and remand for consideration of Sauer's entitlement to an equitable adjustment due to disruption.

*AFFIRMED IN PART, VACATED IN PART, and REMANDED.*