The UNITED STATES of America for the USE AND BENEFIT of CMC STEEL FABRICATORS, INC.,

v.

HARROP CONSTRUCTION COMPANY, INC. and The Glens Falls Insurance Company

v.

Commercial Metals Company.

Civil Action No. C–96–38.

United States District Court, S.D. Texas, Corpus Christi Division.

Dec. 21, 2000.

James F. McKibben, Jr., Barger Hermansen et al, Corpus Christi, TX, William W. Sommers, Gardner & Ferguson, San Antonio, TX, R. Wes Johnson, Carabin Shaw and Johnson, San Antonio, TX, Jay K. Farwell, San Antonio, TX, for The United States of America for the Use and Benefit of CMC Steel Fabricators, Inc.

David D. Peden, Jr., Allison J. Snyder, Greenberg Peden et al, Houston, TX, for Harrop Construction Co., Inc., The Glens Falls Ins. Co.

William W. Sommers, Gardner & Ferguson, San Antonio, TX, R. Wes Johnson, Carabin Shaw and Johnson, San Antonio, TX, for Commercial Metals Co.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

HEAD, District Judge.

**Introduction**

Harrop Construction Company, Inc. ("Harrop") served as a contractor to the United States Navy to build two facilities in 1995 at the Naval Air Station in Ingleside, Texas. These facilities are the Advanced Firefighting Training Facility ("AFT") and the Fleet Mine Warfare Center ("FMW"). During the same time, Texas A & M University had engaged Harrop as a contractor to construct the Center for Environmental Science Studies on its campus at Corpus Christi, Texas ("TAMU–CC"). In its efforts to construct these facilities, Harrop subcontracted with Safety Steel Service, Inc. ("Safety Steel") of Victoria, Texas, to provide structural and reinforcement[1] steel for the three projects, and for AFT steel erection services. The failure of Safety Steel to meet its contractual obligations under its three purchase orders for structural steel and its one contract for erection services are the foundation of this lawsuit.

The plaintiff in our case is CMC Steel Fabricators, Inc., called "Safety Steel" in most instances by the parties and here by the Court. It owns and operates various steel manufacturing facilities including Safety Steel Services, Inc. in Victoria, Texas. Contrary to its name, Safety Steel is not separately incorporated. It is a division, or, as described by the "president" of CMC Steel Fabricators, Inc., an "affiliate." For the two Navy projects, plaintiff is suing defendant contractor Harrop under the authority of the Miller Act, 40 U.S.C. 270a, et seq., because Harrop has not paid for the steel delivered. Harrop agrees that it has not paid for all the steel delivered, and much of the litigation dealt with what was owed by Harrop to Safety Steel for steel delivered late and misfabricated, and perhaps never delivered. For Texas A & M University–Corpus Christi, plaintiff sues under Texas statutory law, Tex. Gov't Code Ann. § 2253.001 et seq. (Vernon Supp.2000). After failing to receive payments from Harrop for deliveries of materials, Safety Steel made claims against The Glens Falls Insurance Company ("Glens Falls"), the issuer of Harrop's payment and performance bonds for the projects.

---

1. The three purchase orders for reinforcement steel are not in issue in this suit.

Jurisdiction is conferred on the Miller Act claims by federal question jurisdiction, 28 U.S.C. § 1331. The Court exercises supplemental jurisdiction, 28 U.S.C. § 1367(a), over Safety Steel's claims for steel to the TAMU–CC project. The claims between the parties are intertwined by virtue of the identities of the parties and the subject matters of the dispute and resolution. They cannot reasonably be tried in the absence of consideration of all steel delivery contracts and activities between the parties.

Harrop filed a counterclaim against the plaintiff. Harrop alleges that Safety Steel breached the contracts calling for timely delivery of properly fabricated structural steel. It also alleges that it was the victim of Safety Steel's fraud in inducing Harrop to buy steel from Safety Steel which Safety Steel knew it could not and ultimately did not deliver as promised. Harrop offered significant evidence that delays and expenses incurred were of such magnitude that it was driven from business by Safety Steel's business practices. Harrop seeks to recover its losses based on Texas state law claims of breach of contract as well as tort claims of fraud and deceptive trade practices.

At the request of the parties, the Court agreed that a jury could be waived and accepted the waiver of the parties' rights to a trial by jury. Much time was spent in preparation for the trial as the parties obtained voluminous records from each other, retained experts to review them, and deposed prospective witnesses. The trial was lengthy, interrupted at one point by a hurricane on the Texas Gulf Coast. The period of review of the record, more lengthy than the Court liked, was caused by the length of the record and organization of the claims and defenses. The Court notes that experts were years into the preparation of this case. Expert reports continued to be filed until the time of the trial and even during the trial itself. Confronted with a massive record, a paper war between the parties, and a totally indigestible pretrial order, the Court has attempted to reduce the issues and clarify. It now enters its decision.

Construction cases are driven by detail and are expert dependent. Each side was armed with their construction claims and delay experts who studied the record and arrived at similar conclusions, varying only by degree. It was the conclusion of the experts that Safety Steel delayed the projects beyond the scheduled completions. Harrop's experts, Mr. Andrew Goldsmith and Ms. Mary Jo Poindexter, found approximately four and one half months of delay while Safety Steel's expert, Mr. Robert McCullough, found delay to be more in the nature of three months. Under either scenario, such delays were clearly in violation of the contracts and ultimately devastating to Harrop.

The case would not have been complete without Safety Steel's lengthy and protracted *Daubert* attack of Mr. Goldsmith and Ms. Poindexter who where engaged by Harrop to analyze and testify on the cause and extent of Safety Steel's failures. These attacks relied on Dr. Colin Popescu, a highly respected professor at the University of Texas, and Mr. McCullough, a civil engineer and claims analysis expert. Both criticized Harrop's experts, Mr. Goldsmith and Ms. Poindexter, for not being sufficiently qualified as well as loyal to the critical path method of claims delay analysis. This method of analysis is the formal approach by courts and experts alike in determining the cause and extent of construction delays. *See, e.g., Sauer Inc. v. Danzig,* 224 F.3d 1340 (Fed.Cir.2000); *Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.,* 175 F.3d 1221 (10th Cir. 1999). The Court found that the methods used by Mr. Goldsmith and Ms. Poindexter were within toleration limits of *Daubert* and construction delay analysis. The Court admitted their testimony and overwhelmingly long reports.

### Safety Steel's Claims & Damages

To defend itself against Safety Steel's evidence of underpaid and unpaid invoices,

Harrop attacked Safety Steel's method of accounting for steel delivery as well as the inadequacies of the fabricated steel and erection services. The internal method used at the facility appears reasonably organized and reliable, if not untidy and somewhat imprecise; but it was not more untidy or imprecise than Harrop's method of accounting for receipt of the delivered steel. Harrop's approach was very casual considering the value of the steel delivered. Throughout trial preparation and the early days of trial, Safety Steel's claim was a moving target and ultimately found repose at $802,484 (after the Court's "inspirational" exhortations for both parties to focus with a view to resolution).

It was from this figure that Harrop began to assert certain other offsets. These specific offsets were brought to the attention of the Court through Ms. Poindexter and Mr. Goldsmith. Ms. Poindexter undertook a laborious review of the deficiencies of Safety Steel's work under the contracts and substantiated to the Court claims asserted by Harrop employees. The Court awards the following as offsets:

1. $298,687 to complete erection services at AFT;

2. $68,612 to correct fabrication errors at FMW;

3. $10,575 for structural material and crane overruns at FMW;

4. $21,743 to avoid payment for expenses to correct joist and girder problem at FMW;

5. $70,011 to correct fabrication mistakes at TAMU–CC.

Considering those offsets, the Court awards $332,856 to Safety Steel for steel delivery.

## Harrop's Claims

### Breach of Contract

In late 1994, Safety Steel entered into three various purchase orders with Harrop to fabricate and deliver all of the structural steel required for the Texas A & M, AFT, and FMW construction projects.

Safety Steel agreed to "furnish and deliver" the steel according to plans and specifications prepared by the various architects, and Safety Steel further agreed to deliver the steel as required by the project schedules. This Court adopts Part VI of the Joint Pre-trial Order which sets forth the particulars of the three general construction contracts Harrop entered into which lie at the heart of this action.

The TAMU–CC Center Office/Laboratory and Boat Storage Building project was to be completed by December 5, 1995, and the Vehicle Maintenance Facility was to be completed by May 9, 1995. The Navy's AFT project was to be completed by February 10, 1996, and the FMW project was to be completed by November 3, 1995. Safety Steel signed purchase orders for steel which stated that "time was of the essence" and construction schedules must be "strictly adhered to." Safety Steel was aware of the deadlines set forth in the three main construction contracts, and in signing the purchase orders, it agreed to comply with the project schedules including furnishing shop drawings for approval. The purchase orders also set forth Safety Steel's agreement to furnish steel which corresponded exactly to the drawings and specifications submitted by the architects.

The Court finds, relying on the testimony of both parties and indeed the admission of breach by plaintiff made in closing argument, that each purchase order for steel as well as the subcontract for erection services, was thoroughly and persistently breached. At each site, there were untimely deliveries of shop drawings, late deliveries, and misdeliveries of steel and misfabrications. Damage was admittedly caused to the defendant's projects.

### Tort Claims

Breach of contract is not the only theory of liability that Harrop seeks to establish. Harrop also offered evidence to establish tort damages under theories of fraudulent inducement, negligent misrepresentation, breach of implied warranty, breach of ex-

press warranty, and deceptive trade practice claims. The Court addresses each one of these theories in the following paragraphs.

**Fraudulent Inducement**

 Fraudulent inducement is a type of fraud that shares the same elements as a simple fraud claim. *DeSantis v. Wackenhut Corporation*, 793 S.W.2d 670, 688 (Tex.1990). Fraud requires "(1) a material misrepresentation (2) which was false (3) which was either known to be false when made or was asserted without knowledge of its truth (4) which was intended to be acted upon (5) which was relied upon, and (6) which caused injury." *Formosa Plastics Corporation USA v. Presidio Engineers and Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex.1998) (quoting *Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d 281, 282 (Tex.1994)). A material misrepresentation may also take the form of passive silence. *American Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 435–37 (Tex.1997). The evidence presented persuades the Court that Safety Steel's actions met each of these required elements and that it committed common law fraud.

 The specific misrepresentation that lies at the heart of Harrop's fraud claim is the representation by Harrop that it had the capacity to timely produce the steel in accordance with the schedules. The contracts and scheduling documents themselves establish that the representations were made. The ability to meet the schedule was induced when in a conversation between Harrop's purchasing agent, Terry Tauriello, and Morris Myers, Safety Steel's sales agent, Mr. Tauriello asked if Safety Steel had the shop capacity to handle the job. Myers said "yes" in various forms— the shop was empty, business was slow, the company needed the work—all indicating to Tauriello and the Harrops that their business needs would be served. In spite of these inquiries, Mr. Myers did not respond truthfully that there was in the shop and committed for delivery a huge job known as the Roncelli project.

The evidence shows that Mr. Myers' misrepresentations about Safety Steel's capacity to handle Harrop's order were false and that Mr. Myers knew they were false at the time they were made. Safety Steel actually had a large project in the shop at the time Mr. Myers was negotiating with Harrop. The Roncelli project represented 3,300 tons of Safety Steel's 8,000 ton capacity and 40% of its annual production. The Court finds from the testimony of Carlisle Maxwell, Safety Steel's facility manager, that Safety Steel never intended to honor its time commitments with respect to the Harrop job. Rod Thompson, Safety Steel's sales manager, also testified that Mr. Myers knew about the Roncelli job at the time he made the misrepresentations to Mr. Tauriello because Mr. Myers had been present at meetings in which the Roncelli project was discussed at length. Therefore, the evidence shows that at the time the misrepresentations were made to Harrop, Safety Steel lacked the manpower and resources to honor its contract with Harrop in a timely manner, and Mr. Myers knew of this inadequacy.

Tom Carey, Safety Steel's general manager, testified that he had a goal of increasing Safety Steel's profits by 50% during the year that the Roncelli and Harrop contracts were entered into. The goal of Carey's "Vision 12,000" was to increase Safety Steel's sales by 12,000 tons. Rod Thompson further testified that the pressure was on at Safety Steel to get more work. Moreover, Marvin Selig testified that Safety Steel did not have the manpower or resources to produce 12,000 tons of steel per year. Safety Steel, including Mr. Myers, was motivated by potential growth and substantial profit increases which were explicit goals of the company.

Finally, on balance the evidence shows that Harrop personnel relied upon the misrepresentations for the various projects, and this reliance caused Harrop injury. Mr. Harrop testified that his construction company usually spread work out among

different suppliers, but Safety Steel's misrepresentations led Harrop to award Safety Steel contracts on all three projects. Mr. Tauriello testified that if he had known about the Roncelli job, he would have known that meeting Harrop's deadlines would be a physical impossibility for Safety Steel. Both Mr. Tauriello and Val Harrop testified that if they had known about the Roncelli project, they would not have awarded all seven contracts to Safety Steel.

Harrop was able ultimately to complete all three of its construction contracts with some extensions, but it suffered extensive economic injuries. Expert witness testimony showed that Harrop was an established business with a history of profit. Safety Steel's breach completely disrupted Harrop's financial stability in 1995. Harrop was forced to devote all of its resources and capital to completing its construction projects on time due to Safety Steel's breach. Harrop also lost its bonding capacity, so it was unable to bid on other public jobs. These resulting financial losses crippled what was previously a profitable and well-respected company.

The Court finds that Safety Steel's actions met all of the required elements of fraud. Accordingly, the Court finds for defendant/counter-plaintiff Harrop on this issue.

### Negligent Misrepresentation Claim

■ In *Formosa Plastics Corporation USA v. Presidio Engineers and Contractors*, the Texas Supreme Court held that tort damages may be recovered for a fraudulent inducement claim even if there is no injury that is separate and distinct from any permissible contract damages. *Formosa Plastics Corporation USA v. Presidio Engineers and Contractors*, 960 S.W.2d 41, 47. In a later case, the Court declared, "The *Formosa* opinion's rejection of the independent injury requirement in fraudulent inducement claims does not extend to claims for negligent misrepresentation or negligent inducement." *D.S.A., Inc. v. Hillsboro Independent School District*, 973 S.W.2d 662, 663 (Tex.1998). Because Harrop failed to produce evidence of an injury separate and distinct from that which it suffered due to the breach of contract, its claim for negligent misrepresentation is denied.

### Breach of Implied Warranty and Express Warranty

In *Melody Home Mfg. Co. v. Barnes*, the Texas Supreme Court held that the implied warranty of construction in a good and workmanlike manner extended to repair services for tangible goods or property, as well as construction. *Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 353 (Tex.1987). *Melody Home* involved repair services in a residential context. Harrop offers no precedent extending the implied warranty recognized in *Melody Home* to the commercial contracts between contractor and subcontractor.

In any event, during closing arguments no mention was made by Harrop that the Court should consider these issues and make findings on them. The Court considers those claims not submitted and waived. The Court does not feel qualified or compelled to frame Harrop's arguments and submissions on these issues.

### DTPA Claims

Harrop's pretrial order details a laundry list of allegations that Safety Steel violated various sections of the DTPA. As with the warranty issues, Harrop did not address during its closing arguments whether it was pursuing the DTPA claims, and if so, which, if any, of the claims it was pursuing. The Court feels no compulsion to guess if the claim remains unpursued or to craft Harrop's thoughts on these matters.

■ Because it requires no guesswork on the part of the Court as to the components, legal and evidentiary, and because the Court has already made the appropriate findings, the Court finds that Safety Steel violated Section 17.46(b)(23) of the DTPA by fraudulently inducing Harrop to

enter into the contracts. This claim appears in the pretrial order.

"The duty not to make misrepresentations or to make certain disclosures during the contract formation stage is imposed by law independent of a contract, and thus, is actionable under the DTPA." *Howell Crude Oil Co. v. Donna Refinery Partners, Ltd.,* 928 S.W.2d 100, 109 (Tex. App.—Houston [14th Dist.] 1996, writ denied). The DTPA states that a "false, misleading, or deceptive act or practice" includes "the failure to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed." Tex. Bus. & Comm. Code § 17.46(b)(23). "To prove a DTPA action for failure to disclose, a plaintiff must show the following:

1. A failure to disclose information concerning goods or services;

2. Which was known at the time of the transaction;

3. Which was intended to induce them into a transaction; and

4. That they would not have entered into the transaction if the information had been disclosed."

*Colonial County Mutual Insurance Company v. Valdez,* 30 S.W.3d 514, 517 (Tex. App.—Corpus Christi 2000). Furthermore, the failure to disclose must "constitute a producing cause of economic damages or damages for mental anguish." Tex. Bus. & Comm.Code. § 17.50(a).

The Court finds for Harrop on this issue because the evidence shows that Safety Steel's conduct met each of these required elements, and the conduct was a producing cause of Harrop's damages.

### Harrop's Damages

Harrop seeks millions of dollars in damages, from direct to consequential to punitive. In reaching the availability of damages, the Court applies different standards of causation.

■ With respect to its claims of breach of contract, the Court recognizes that Texas law allows two broad categories—direct and consequential. *Mead v: Johnson Group Inc.,* 615 S.W.2d 685 (Tex.1981); *see also Frost National Bank v. Heafner,* 12 S.W.3d 104, 110 n. 5 (Tex.App.—Houston [1st Dist.] 1999). "Direct damages are those which naturally and necessarily flow from a wrongful act, or are so usual an accompaniment of the kind of breach alleged that the mere allegation of the breach gives sufficient notice, and are conclusively presumed to be foreseen or contemplated by the party as a consequence of his breach of contract." *Hess Die Mold, Inc. v. American Plasti-Plate Corp.,* 653 S.W.2d 927, 929 (Tex.App.—Tyler 1983, no writ); *see also Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 816 (Tex.1997). Consequential damages may be recovered only if proved to be "the natural, probable, and foreseeable consequence" of the defendant's breach. *Mead v. Johnson Group Inc.,* 615 S.W.2d at 687.

■ With respect to its proven claims of fraudulent inducement, the Court applies two broad measures of direct damages for common law fraud—out-of-pocket measure and benefit of the bargain measure. *Formosa Plastics Corporation USA v. Presidio Engineers and Contractors,* 960 S.W.2d 41, 49 (Tex.1998). "The out of pocket measures computes the difference between the value paid and the value received, while the benefit of the bargain measures computes the difference between the value as represented and the value received." *Id.* "Under the benefit of the bargain measures, lost profits on the bargain may be recovered if such damages are proved with reasonable certainty." *Id.* 960 S.W.2d at 50. To be recoverable, consequential damages must be the proximate result of fraud. *Airborne Freight Corp. v. C.R. Lee Enterprises,* 847 S.W.2d 289, 295 (Tex.App.—El Paso 1992, writ denied).

The damages available to DTPA plaintiffs are those recoverable at common law. *Brown v. American Transfer & Storage Co.*, 601 S.W.2d 931, 939 (Tex.1980). Traditional measures of damages for misrepresentation are the out of pocket and benefit of the bargain measures. *Leyendecker & Associates v. Wechter*, 683 S.W.2d 369, 373 (Tex.1984). A wide variety of incidental and consequential damages are also recoverable. *Kish v. Van Note*, 692 S.W.2d 463, 466–67 (Tex.1985). Proof of forseeability is not required to recover consequential damages, such as lost profits, under the DTPA. *Hycel, Inc. v. Wittstruck*, 690 S.W.2d 914, 922–23 (Tex.App.—Waco 1985, writ dism'd). "For DTPA claims, the plaintiffs need only show producing cause and need not establish that the harm was foreseeable." *Doe. v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 481 (Tex.1995). "A producing cause is a substantial factor which brings about the injury and without which the injury would not have occurred." *Id.*

The Court finds that the direct damages that are available to Harrop are virtually the same under any theory of liability and causation. The Court has earlier awarded some offsets to Harrop in the form of direct damages it took to correct Safety Steel's errors in erection and fabrication.

Safety Steel concedes that it breached its contract with Harrop by failing to comply with the project schedule to furnish drawings and furnishing steel which did not meet the specifications submitted by the architects. Safety Steel also concedes that this breach caused delay on the project sites. Harrop was ultimately able to complete the buildings on time, but they were forced to expend much of the company's capital and resources in order to do so. Because the parties agree that a breach occurred, and this breach caused delay, the dispute centers around the extent of damages, as well as alternative legal theories of liability.

Both parties acknowledge that various breaches including failure to deliver shop drawings on time, failure to coordinate with subcontractors, and failure to properly fabricate steel breached the contracts and resulted in delay. For Safety Steel, Mr. McCullough calculated 108 days, being slightly over three months. For Harrop, Mr. Goldsmith and Ms. Poindexter calculated in two separate reports four to five months. The Court has done its best to determine which of these experts is more likely to be correct than the other. The Court favors Mr. McCullough for the most part because his approach appears more faithful to a critical path analysis. Ms. Poindexter's approach is criticized by Dr. Popescu for meaning nothing, but it was very helpful to the Court in showing to the Court pertinent other evidence with respect to Safety Steel's production activities and for whom those activities were directed and favored. The Court feels no duty to be any more precise than the experts, and it is apparent to the Court that there is much judgment that must be applied by whomever is making the analysis and by what method. The Court finds that the overall project delays for all three projects defined is in the neighborhood of four months. Fleet Mine Warfare suffered inexcusably and unnecessarily from the failure of Safety Steel to coordinate a constructable joint between girders and columns.

Those delay damages to the three projects are calculated by Mr. McCullough as $767,549 and by Ms. Poindexter as $1,891,353. Again, the Court feels no more duty to be more precise on these figures than these experts. The Court weighs heavily McCullough's estimate. Using the critical path methodology, Mr. McCullough provided a tighter analysis and did a better job tying and analyzing relationships between job occurrences and job events, providing a tighter and more conservative approach to the flow of events and therefore delays. The CPM is an accepted and even favored methodology for such analysis. *See e.g., Sauer Inc. v.*

*Danzig,* 224 F.3d 1340 (Fed.Cir.2000). Each requires significant judgment under an imprecise method of calculating delay. The Court recognizes the loyalties of the parties and credits the credibility accordingly.

The Court also credits the work of Poindexter and Goldsmith. Both developed their own methodologies, modifications of the critical path method. Of the experts, the Court credits McCullough and Popescu but believes following their model too closely disregards the testimony of the contractor's supervising employees such as Jack Mount and Judy Jones. The Court's own review convinces it that Mr. McCullough's total project costs are low by approximately $300,000.

■■■ The Court has given significant thought to the claims for consequential damages caused by breach of contract and fraud. Foreseeability is required for those claims but not for the claims of deceptive trade practices. The Court does not find that the loss of Mr. Harrop's business was foreseeable by Safety Steel. Many factors go to the foreseeability of such claims. The Court does not believe that Safety Steel could reasonably have appreciated that its misdeeds would arise to the magnitude of destruction of a business. Many factors—management abilities, company strength, and market opportunities—influence firm viability. Considering all of these factors, Harrop fails to meet its burden of proof.

Forseeability is not a causation factor in deceptive trade practice claims. The Court has found a deceptive trade practice on the part of Safety Steel flowing from its behavior. Accepting the testimony of Mr. Harrop, other Harrop employees, and its CPA over the hindsight testimony of the experts, the Court finds that it is more likely than not that Safety Steel's behavior caused the loss of the business.

To address these consequential damages, the Court was invited by the parties to consider an array of damages. The Court chooses as the clearer method of evaluating the damages caused to be the value of the business lost. This choice is suggested by Don Hanke who was offered by Safety Steel as its expert. Mr. Hanke is certified by the American Institute of Certified Public Accountants as a valuation expert of businesses. He has valued businesses several hundred times. His experience exceeds that of Mr. Malone, Harrop's expert and Certified Public Accountant.

■■■ Anyone listening to the testimony of these experts would conclude, as has the Court, that determining the value of this business (like determining the cause and extent of delay) is anything but precise. Each expert has offered several methods. The Court rejects the "hurried" earnings capitalization method. The Court rejects the discounted future cash flow (insufficient history) and multiples method suggested by Malone (lack of good comparables). The Court finds an appropriate approach is a combination of methodologies. The Court compares the book value of $1.6 million, a financial statement value of $2 million, and a comparable value as offered by Hanke for non-public construction businesses of $1,350,000. The Court averages those figures and determines a reasonable value of the business to be $1,650,000. The Court declines to impose a marketability discount there being no urgency to the sale nor evidence that such would be required in this case. The business is a going concern and the Court sees no good reason to find otherwise.

The Court does, however, reduce the business value by $500,000, being the amount of the outstanding loan to the shareholders. These loans are not equity contributions but truly loans and as such reduce the net worth of the company by $500,000. Therefore, the Court awards as the value of the company $1,150,000.

### Punitive Damages

■■■ Finding the fraudulent behavior of Safety Steel egregious, the Court

grants Harrop an award of exemplary damages on its fraud claim. *Artripe v. Hughes*, 857 S.W.2d 82, 87 (Tex.App.—Corpus Christi 1993, writ denied). The Court also awards exemplary damages under the Texas Commerce & Business Code § 17.50. That statute requires a knowing violation of a deceptive trade practice before punitive damages can be awarded under its authority. The Court has already made such finding with respect to the common law fraud claim and again makes it here.

Section 17.50 allows the Court to award up to three times the economic damages of the case. The Court has evaluated many factors in determining the particular level of the multiplier. In considering such an award, the Court has considered that the consequences of the misrepresentation to Harrop were beyond severe—they were devastating. The consequences had the potential to affect severely three projects critical to the public interest, two being national defense projects. The Court also considers that there were numerous opportunities during the course of the relationship to mitigate damages to Harrop. Those opportunities were not taken and, in some instances, resisted. For the foregoing reasons, the Court believes the statutory maximum of treble damages is appropriate.

The Court also must calculate punitive damages for the common law fraud claim. Harrop has moved for a separate hearing. *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10 (Tex.1994). The Court denies the hearing and the opportunity to submit additional evidence. The Court already has before it in the record the 1996 Commercial Metals Company annual report to its shareholders. In that year it claimed assets of $766,756,000 and retained earnings of $262,772,000. It remains a strong public company today. The Court recognizes that the conduct authorizing punitive damages for the common law fraud claim is the very same conduct as for the deceptive trade practice claim. The State of Texas in § 17.50 has authorized treble damages as a maximum recoverable multiple. The Court believes that it is a presumptively persuasive amount, especially considering that the value of the Harrop business will be taken into consideration under DTPA claims. While the Court could award more under *Moriel* by considering the value of CMC, it chooses not to do so, finding that the factors of calculating exemplary damages of that case and cases since that time are adequate compensation of the very damages calculated in reliance on TCBA § 17.50.

### Piercing the Corporate Veil

 Harrop joined as a third-party defendant Commercial Metals Company, the ultimate parent of the defendant CMC Steel Fabricators, Inc. Harrop pursues a theory that, even though CMC was not a party to the contracts between Safety Steel and itself, CMC may not use its separate incorporation from CMC Steel Fabricators, Inc. to shield itself. Harrop hopes to pierce the corporate veil relying upon Texas law expressed by *Castleberry v. Branscum*, 721 S.W.2d 270 (Tex.1986), and the Texas Business Corporation Act. *See* Tex. Bus. Act. Ann. Art. 2.21(A)(2) (Vernon Supp.2000). Specifically, Harrop alleges that CMC was using Safety Steel, a division of CMC Steel Fabricators, to perpetuate a fraud on its customers, specifically including Harrop, and organized its corporate structure so that Safety Steel was serving as an alter ego of itself.

The controlling statute for this litigation is the statute as it was written immediately prior to the last amendment, which became effective September 1, 1997. Under either the pre-September 1, 1997, or the amendments that took effect on that date, Harrop would have to show actual fraud on the part of CMC before Harrop could reach it. *Menetti v. Chavers*, 974 S.W.2d 168 (Tex.App.—San Antonio 1998). The Court has reviewed the record and finds insufficient evidence to conclude that the corporate entity, Commercial Metals Com-

pany, participated in either contract formation or nonperformance with Harrop.

*Opportunity remains for Harrop to pierce the corporate veil for its tort claims.* Traditionally, Texas cases have attempted to treat contract claims and tort claims differently in an attempt to pierce the corporate veil. *Menetti v. Chavers,* 974 S.W.2d 168 (Tex.App.—San Antonio 1998), and cases cited therein. Although that distinction was erased on September 1, 1997, by amendment to the Texas Business Corporation Act, art. 2.21(a)(2), that same statute specifically excluded application of the amendment to cases pending on September 1, 1997, as was this case. Act of May 1, 1997, 75th Leg., Ch. 375, § 125(e).

■■■ Texas law honors the distinction between corporations and their subsidiaries unless the parent manipulates the relationship between itself and its subsidiary to such degree that the lines of distinction between the two corporations are blurred and the protection of the parent would work an injustice on those injured by the parent. That is the essence of the alter ego theory. *Gardemal v. Westin Hotel Company,* 186 F.3d 588, 593 (5th Cir.1999). Such is the charge here and the Court finds such is the fact. The Court has already found the defendant CMC Steel Fabricators, d/b/a Safety Steel, Inc., its division, as having committed torts against Harrop by perpetrating a fraud upon it and committing deceptive trade practices against it. While no active role can be assigned in these contractual series of events to CMC, an alter ego relationship exists.

Strong evidence of identity between CMC Steel Fabricators, Inc. and Commercial Metals Company exists as shown in the testimony of Marvin Selig, the president of CMC Steel Fabricators and Milton Davis, the assistant comptroller of Commercial Metals Company. While Davis testified as the faithful corporate representative for CMC that Marvin Selig was the president of CMC Steel Fabricators, Inc. and that it had a board of directors, Marvin Selig neither recognized himself as the president of CMC Steel Fabricators nor understood that it had a board of directors. Selig is a founder of CMC and sits on its Board. The Chair of CMC's Board sits on CMC Steel Fabricators's alleged board of directors. Whether on paper Mr. Selig is the president or not of a corporation called CMC Steel Fabricators, Inc. is of little persuasive moment because it is apparent that the reality of the operations reflects the unity in Selig's mind between Commercial Metals Company on the one hand and CMC Steel Fabricators, Inc. and their operating plants on the other. CMC owns all of the stock in CMC Steel Fabricators, Inc. They filed consolidated financial reports and view themselves as a vertically integrated company. The subsidiary operates grossly under capitalized, as do all of its "affiliates." Each night, positive revenues are swept from the bank accounts of Steel Fabricators plant sites and placed under the control of Commercial Metals Company, protecting CMC from any indebtedness that might be imposed upon the operating plant sites. No one but the chief executive of CMC could authorize payment of the judgment in this case. Mr. Selig has no such authority. He is not paid by CMC Steel Fabricators but by another CMC subsidiary. CMC has at least once used this corporate arrangement to its advantage when a judgment of the Houston Division of this Court was entered against another subsidiary of CMC. It has gone unpaid. With this history of operations, there is little doubt that Commercial Metals will treat any judgment of this court against CMC Steel Fabricators, Inc. with little regard.

The Court therefore disregards the corporate distinction between Commercial Metals Company and CMC Steel Fabricators, Inc. and finds that this order and the judgment to be entered will apply no less to Commercial Metals Company for all tort damages than it does to CMC Steel Fabricators, Inc.

Based upon all of the foregoing, the Court finds by a preponderance of the evidence that CMC Steel Fabricators, Inc. is entitled to recover $332,856 for steel sold and delivered and that Harrop Construction Company, Inc. is entitled to recover from CMC Steel Fabricators, Inc. and Commercial Metals Company as compensatory damages $2,217,549 and exemplary damages of $6,652,647, for a total award of $8,870,196. Each party is entitled to recover interest on the compensatory damages awards to date of judgment and thereafter on all damages until paid. Harrop Construction Company is awarded its attorneys' fees and costs. CMC Steel Fabricators, Inc. is not awarded attorneys' fees and must sustain the expense of its costs. The Court finds that CMC Steel Fabricators, Inc.'s own breaches of the contract caused its misery and is therefore not the prevailing party entitled to recover attorneys' fees.

The parties are ordered to confer no later than January 4, 2001, and report to the Court no later than January 5, 2001, on the issues of agreed interest rates and amounts of attorneys' fees and costs. Harrop Construction Company, Inc. is ordered to prepare a Judgment and submit it to the Court for its approval no later than January 12, 2001.