**PCL CONSTRUCTION SERVICES, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 95–666C, 96–442C.**

United States Court of Federal Claims.

Aug. 28, 2002.

Herbert L. Fenster, McKenna, Long & Aldridge, L.L.P., Denver, Colorado, attorney of record for the plaintiff. Joanna C. Kitto, of counsel.

Brian S. Smith, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., and David M. Cohen, Director, for the defendant.

## OPINION

HORN, Judge.

### FINDINGS OF FACT

The above captioned case concerns a contract between the government and the plaintiff, PCL Construction Services, Inc. (PCL), for the construction of a Visitor's Center and Parking Structure at the Hoover Dam. This opinion addresses two of three remaining issues, PCL's entitlement to amounts retained by the government for liquidated damages and PCL's entitlement for amounts retained by the government for uncompleted punch list items. The court is awaiting the conclusion of settlement negotiations regarding the other remaining issue in the case, the defendant's counterclaim regarding an allegedly defective turntable. The parties continue to inform the court that settlement discussions are proceeding well and that settlement remains likely on the turntable issue. Although it was anticipated that this opinion would be issued simultaneously with resolution of the turntable issue, and, therefore, resolve all the issues in the cases, the court has decided to release this opinion while the parties continue to engage in settlement of the remaining issue in anticipation of further encouraging settlement.

PCL filed two complaints (Case Nos. 95–666C and 96–442C) against the United States, arising from the alleged actions of the United Stated Bureau of Reclamation (USBR). PCL seeks recovery of over $31,000,000.00 under "breach of contract" and "illegal contract" theories in Case No. 95–666C, and over $1,300,000.00 million under "breach of contract," "improper termination for default," and "illegal assessment of liquidated damages" in Case No. 96–442C. On October 4, 1995, PCL filed a "preliminary complaint" premised upon a contracting officer's final decision denying PCL's July 27, 1995 certified claim for $31,040,071.00 based upon alleged breach of contract and illegality of contract. This complaint was assigned

Case No. 95–666C. This complaint was amended on April 1, 1996, following discovery. The plaintiff's counts in Case No. 95–666C assert breach of contract premised upon fraud in the inducement and misrepresentation by the government (Counts I, II and IV), breach of contract premised upon superior knowledge by the government (Counts III and VI), breach of contract arising from a breach of warranty by the government (Count V), breach of contract stemming from hindrance and delay by the government (Count VII), cardinal change (Count VIII), illegal contract (Count IX), and Antideficiency Act violation (Count X). Shortly after the amended complaint in Case No. 95–666C was filed, PCL filed a second complaint on July 23, 1996, which was assigned Case No. 96–442C. The complaint in this second action was premised upon (1) a contracting officer's final decision denying PCL's November 22, 1995 certified claim for $1,351,838.00 seeking monies retained by USBR, (2) a March 11, 1996 letter from the contracting officer terminating PCL for default based upon an alleged breach of the contract by PCL, and (3) a March 26, 1996 letter from the contracting officer assessing liquidated damages against PCL in the amount of $1,285,800.00.

This court granted summary judgment in the government's favor on Count X of Case No. 95–666C, PCL's claim that alleged the contract was illegal due to violations of 31 U.S.C. §§ 1341, 1342, and 1502, statutes which are directed at precluding the award of government contracts in excess of, or in advance of, appropriations and forbid the acceptance of voluntary services. See PCL Constr. Servs., Inc. v. United States, 41 Fed. Cl. 242, 264 (1998). Trial was held on the remaining claims. Construction of the Parking Structure and Visitor Center at the Hoover Dam was complex and difficult. The facts of this case, and the problems encountered by the parties during construction of the project, were fully detailed in this court's lengthy post-trial opinion, PCL Construction Services, Inc. v. United States, 47 Fed.Cl. 745 (2000), and those facts are incorporated into this opinion. Only a brief recitation of the most pertinent facts to the present motion will be repeated here.

The government awarded PCL the contract for the construction of the Visitor Center and Parking Structure on September 5, 1991. The government issued a notice to proceed to PCL on October 21, 1991. The scheduled completion date for the Parking Structure was February 15, 1992. The scheduled completion date for the Visitor Center was July 15, 1993. In April, 1994, approximately two and one-half years after the government issued a notice to proceed to PCL, plaintiff submitted an uncertified Request for Equitable Adjustment (REA), claiming entitlement to recover $23,229,471.00 and to a schedule extension of 363 days because of delays and disruptions arising from alleged defective contract drawings and specifications, differing site conditions, time required for resolution of Requests for Information (RFI), and time impacts due to contract changes. On February 24, 1995, USBR notified PCL that it had evaluated the REA and requested that PCL participate in a fact-finding session regarding preparation of an as-built schedule in order to agree upon responsibility for critical delays to the project. PCL interpreted this as a denial of the REA in its entirety.

In a letter dated March 14, 1995, the contracting officer stàted that an assessment of liquidated damages would be made against PCL when "responsibilities for time associated with delays are made." The contracting officer also stated that liquidated damages would then be assessed against PCL for those delays which are "not found to be the responsibility of the Government . . . ." Less than three months later, on June 9, 1995, the contracting officer issued to PCL a Certificate of Substantial Completion certifying that the contract was substantially complete as of May 11, 1995. PCL was notified that the project was considered to be substantially complete except for the results of the joint inspection on May 12, 1995, and the "deficient items noted and listed during the [previous] joint inspections." The USBR began using the Visitor Center and Parking Structure on May 12, 1995 and has continued to do so. The USBR opened the facilities for tourism on June 21, 1995.

Despite not having completed all of the previously listed deficiencies, PCL requested the final acceptance inspection to be held on August 25, 1995. PCL's request was contrary to the terms of the contract, which required PCL to request final acceptance only when all contract work was considered to be complete. Therefore, USBR rejected PCL's request. PCL withdrew its request for a final acceptance inspection and outlined a procedure to address the remaining deficiency items, and requested a consolidated deficiency listing. USBR provided PCL with a consolidated deficiency listing and concurred with PCL's suggested procedure for resolving the deficiency items. USBR also reminded PCL of its obligation to provide a written certification that the contract work had been completed in accordance with contract section 01700 1.10.A. PCL never provided the required written certification.

PCL and some of its subcontractors remained on site performing under the contract until November, 1995. At trial, government witnesses testified that most of the items on the deficiency lists in Exhibit 2147 remained outstanding to the day of the trial.

PCL filed a breach of contract claim on July 25, 1995 with USBR's contracting officer in the amount of $31,040,071.00. At approximately the same time, USBR notified PCL that it was retaining money from PCL pursuant to USBR's interpretation of the contract: "[C]ontinued withholding of funds is necessary for the protection of the Government's interest in accrued liquidated damages, outstanding required submittals, and credits due the Government for changes and/or reductions in work." PCL requested release of the retainage on August 4, 1995. The USBR denied the request for release of the retainage on August 22, 1995 and acknowledged the continued retainage of monies for the protection of the government. On September 21, 1995, the contracting officer issued her final decision denying the breach of contract claim in its entirety.

On November 22, 1995, PCL submitted a certified claim in the amount of $1,351,838.00 for monies retained by USBR. PCL notified USBR that it had performed the contract and was entitled to the retained money. In

addition, PCL stated it would perform no additional work as it believed that the work requested was outside the scope of the contract and USBR's withholding of funds was contrary to contract requirements. PCL's letter of November 22, 1995, stated: "PCL will therefore perform no additional work related to the contract; and, PCL is advising its subcontractors that any work performed for the Bureau on this contract will be at their own risk."

On January 23, 1996, the contracting officer responded to PCL's election to stop work in November, 1995 and denied PCL's claim for monies withheld in its entirety. The USBR took exception to PCL's statement that work under the contract was complete and interpreted PCL's November 22, 1995 letter as an "express and unequivocal repudiation" of PCL's remaining contractual obligations. In addition, USBR informed PCL that a failure by PCL to respond within ten days of the letter would result in a demand upon sureties to complete any remaining work.

On March 6, 1996, the contracting officer notified PCL that the government was terminating the contract for default based on PCL's alleged breach of contract:

> The contract, which is dated September 5, 1991, is terminated for default because of PCL's breach of the contract. On November 22, 1995, PCL provided an express and unequivocal repudiation of the contract by notifying the government that PCL would perform no additional work related to the contract. My letter of January 23, 1996 advised PCL of the consequences of such action and gave PCL 10 days to reconsider its repudiation of the contract. PCL has not responded to the January 23, 1996, letter and has not continued performance of the contract.
>
> Accordingly, I find PCL's failure to perform is not excusable and that PCL's right to proceed further under the contract is hereby terminated.

USBR notified the sureties that PCL was terminated for default.

In making the termination decision, the contracting officer testified that she considered the relevant factors required by FAR § 49.402–3, but did not prepare a detailed written analysis that enumerated consideration of the regulatory factors. The contracting officer did sign a document titled "Justification for Termination of Default," in which she discussed various events throughout contract performance and concluded that the termination for default was proper. The contracting officer did not conclude that a termination for convenience, in lieu of a termination for default, was appropriate. Instead, the contracting officer noted:

> PCL has taken the stance that substantial completion is final completion, the Bureau has breached the contract, and therefore, they are not required to perform, which is not in accordance with the contract....
>
> In a January 23, 1996 letter I informed PCL they were in breach of contract and gave them 10 days to reconsider their position and stated the consequences of such actions.... As of this date, PCL has not responded. It is not practical to issue a show cause or cure notice, therefore the only recourse is to immediately terminate for default....

The contracting officer's March 6, 1996 letter terminated the contract for default.

On March 26, 1996, the contracting officer notified PCL of the assessment of liquidated damages in the amount of $1,285,00.00 due to USBR's decision that PCL had not "provided support demonstrating entitlement to delays." The liquidated damages letter did not assign responsibility for delay either to PCL or to USBR, nor extend the completion date of the contract beyond two days provided for the completion of the Visitor's Center in Modification 26 of the contract for approved delays. The letter did state that the amount was a "preliminary assessment" and that "[i]f it is found at a future date that PCL is entitled to excusable delays the above amount will be offset accordingly." [1]

---

1. The contracting officer also testified that USBR had not determined the extent to which USBR was responsible for delays at the time she assessed liquidated damages, that as of that date she had no opinion as to the extent of PCL's responsibility although believing that PCL caused

On September 20, 2000, the court issued its lengthy post-trial opinion on most of the remaining legal and factual issues raised by the parties. *PCL Constr. Servs., Inc. v. United States*, 47 Fed.Cl. 745. The court did not address the issue of liquidated damages because the plaintiff requested that assessment of liquidated damages be delayed until the plaintiff was in a position to submit a time impact evaluation that might excuse some liability. *Id.* at 812. Following settlement attempts by the parties and the court to resolve the remaining issues, and additional related litigation concerning the defendant's counterclaim, the parties agreed to submit supplemental briefings on the retained monies issues: liquidated damages and uncompleted work. The parties have continued to conduct settlement discussions on the defendant's turntable counterclaim between themselves and PCL's surety. According to a June 14, 2002 status report, the parties had expected to resolve the counterclaim within thirty days. Recently, the court was informed that settlement negotiations are proceeding and that settlement of the turntable issue still remains likely.

## DISCUSSION

### I. Liquidated Damages

In *Sauer Inc. v. Danzig*, 224 F.3d 1340 (Fed.Cir.2000), the United States Court of Appeals for the Federal Circuit stated generally: "[A] party asserting that liquidated damages were improperly assessed bears the burden of showing the extent of the excusable delay to which it is entitled." 224 F.3d at 1347 (citing *Dean Constr. Co. v. United States*, 188 Ct.Cl. 62, 66–68, 411 F.2d 1238, 1240–41 (1969); *N. Va. Elec. Co. v. United States*, 230 Ct.Cl. 722, 723 (1982); *In re Cent. Ohio Bldg. Co.*, P.S.B.C.A. No. 2742, 92–1 B.C.A. (CCH) ¶ 24,399, at 121,824, 1991 WL 187546 (1991)). In *Central Ohio Building Co.*, P.S.B.C.A. No. 2742, 92–1 B.C.A. (CCH) ¶ 24,399, at 121,824, 1991 WL 187546, a case cited favorably by the Federal Circuit in *Sauer Inc. v. Danzig*, 224 F.3d at 1347, the Postal Service Board of Contract Appeals provided a more detailed explanation of the burden of proof with regard to a government claim for liquidated damages. According to the Board, with regard to a liquidated damages claim, the government has "the ultimate burden of persuasion as well the initial burden of going forward to show that the contract was not completed by the agreed contract completion date and that liquidated damages were due and owing." *In re Cent. Ohio Building Co.*, P.S.B.C.A. No. 2742, 92–1 B.C.A. (CCH) ¶ 24,399, at 121,824, 1991 WL 187546. The government may meet its initial burden by showing that "the contract performance requirements were not substantially completed by the contract completion date and that the period for which the assessment was made was proper." *Id.* Once the government satisfies its initial burden, the burden of going forward shifts to the contractor "to show that any delays were excusable and that it should be relieved of all or part of the assessment." *Id.*

The general rule expressed in *Sauer* and *Central Ohio Building Co.*, that, once the government has met its initial burden of going forward, the contractor must prove excusable delays to be relieved of all or part of the liquidated damages assessed, has not been applied, however, when the government has contributed to the delay of the completion of the contract. In *United States v. United Engineering & Constructing Co.*, 234 U.S. 236, 242, 49 Ct.Cl. 689, 34 S.Ct. 843, 58 L.Ed. 1294 (1914), the United States Supreme Court held that in order to enforce a liquidated damages clause, the government "must not prevent the performance of the contract within the stipulated time[.]" When performance of the contract is delayed by the government and the contractor, "the rule of the original contract cannot be insisted upon, and liquidated damages measured thereby are waived." *Id.*

Likewise, in *Acme Process Equipment v. United States*, 171 Ct.Cl. 324, 347 F.2d 509 (1965), *rev'd on other grounds*, 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966), *reh'g denied*, 385 U.S. 1032, 87 S.Ct. 738, 17 L.Ed.2d 680 (1967), the United States Court of Claims specifically addressed the situation in which the government attempts to recover liquidated damages in contracts during the

some delays, and as of that date she knew that

there were USBR-caused delays as well.

performance of which concurrent delay occurred. The court held that " '[w]here delays are caused by both parties to the contract the court will not attempt to apportion them, but will simply hold that the provisions of the contract with reference to liquidated damages will be annulled.' " 171 Ct.Cl. at 367, 347 F.2d at 535 (quoting *Schmoll v. United States*, 91 Ct.Cl. 1, 28, 1940 WL 4133 (1940) and citing *United States v. United Eng'g & Constructing Co.*, 234 U.S. 236, 242, 49 Ct.Cl. 689, 34 S.Ct. 843, 58 L.Ed. 1294 (1914); *Vogt Bros. Mfg. Co. v. United States*, 160 Ct.Cl. 687, 709, 1963 WL 8571 (1963); *Commerce Int'l Co. v. United States*, 167 Ct.Cl. 529, 543, 338 F.2d 81, 90 (1964)); *accord Fortec Constructors v. United States*, 8 Cl.Ct. 490, 508 (1985), *aff'd*, 804 F.2d 141 (Fed.Cir.1986); *Prestex, Inc. v. United States*, 3 Cl.Ct. 373, 382 (1983), *aff'd*, 746 F.2d 1489 (Fed.Cir.1984) (table); *In re Bildon, Inc.*, A.S.B.C.A. No. 46,937, 95–1 B.C.A. (CCH) ¶ 27,562, at 137,366, 1995 WL 113489 (1995); *In re Gaffny Corp.*, A.S.B.C.A. No. 37,639, 94–1 B.C.A. (CCH) ¶ 26,522, at 132,-010, 1993 WL 493326 (1993). *Acme Process Equipment* involved a contract for the manufacture of 75mm. recoilless rifles. 171 Ct.Cl. at 331–32, 347 F.2d at 513. Although the government forgave many delinquent deliveries, it assessed liquidated damages on others. *Id.* The court found that some of the delays were the result of the inexperience and incompetence of the contractor's personnel. *Id.*, 347 F.2d at 534. The court also found, however, that delays were caused by defects in equipment furnished by the government. *Id.* at 534–35. Because the court found delay on both parties, the court held that the liquidated damages clause of the contract should be annulled. *Id.* at 535. The court stated that this result was fair because:

> It does not deprive the Government of an opportunity to prove and recover its actual damages caused by the contractor's delay; instead, the defendant merely loses its right to insist on an artificial measure of damages agreed on by the parties for the situation in which the contractor alone is responsible for the delay.

*Id.* (footnotes omitted).

Some courts and boards, however, have criticized the rule in *Acme Process Equip-ment*, also known as the "rule against apportionment," as too harsh and outdated. *See, e.g., E.C. Ernst, Inc. v. Manhattan Constr. Co.*, 551 F.2d 1026, 1038–39 (5th Cir.), *modified*, 559 F.2d 268 (5th Cir.1977), *cert. denied*, 434 U.S. 1067, 98 S.Ct. 1246, 55 L.Ed.2d 769 (1978); *In re Santa Fe, Inc.*, V.A.B.C.A. No.1943, 84–2 B.C.A. (CCH) ¶ 17,341, at 86,-409, 1984 WL 13360 (1984). Thus, some courts and boards have attempted to apportion concurrent delay in assessing liquidated damages. *E.C. Ernst, Inc. v. Manhattan Constr. Co.*, 551 F.2d at 1038–39; *United States ex rel. Thorleif Larsen and Son, Inc. v. B.R. Abbot Constr. Co.*, 466 F.2d 712, 714 (7th Cir.1972); *In re J.W. Creech, Inc.*, A.S.B.C.A. No. 45,454, 94–1 B.C.A. (CCH) ¶ 26,459, at 131,662, 1993 WL 625480 (1993); *In re Consol. Constr., Inc.*, G.S.B.C.A. No. 8871, 88–2 B.C.A. (CCH) ¶ 20,811, at 105,209, 1988 WL 63386 (1988); *In re Santa Fe, Inc.*, V.A.B.C.A. No.1943, 84–2 B.C.A. (CCH) ¶ 17,341, at 86,409; *In re Midstate Constructors, Inc.*, P.S.B.C.A. No. 913, 81–1 B.C.A. (CCH) ¶ 14,898, at 73,702, 1981 WL 6937 (1981). In *E.C. Ernst, Inc. v. Manhattan Construction Co.*, 551 F.2d at 1038–39, the United States Court of Appeals for the Fifth Circuit offered its reasoning for permitting the apportionment of fault in liquidated damages situations when there existed concurrent delay. The court explained:

> The opposing rule [the rule against apportionment] is an old one whose underlying policies do not remain in full force. One of the dominant reasons underlying it is early judicial hostility to the use of privately agreed upon contract damage remedies. *See, e.g., Mosler Safe Co. v. Maiden Lane Safe Deposit Co.*, 199 N.Y. 479, 93 N.E. 81 (1910):
>
> > While such an agreement has not the harshness of a penalty, it is, nevertheless, in its nature, such that its enforcement, where the party claiming the right to enforce has, in part, been the cause of delay, would be unjust.
>
> Today, given the increasing complexity of contractual relationships, liquidated damage provisions have obtained firm judicial

and legislative support. *See, e.g., Otinger [v. Water Works & Sanitary Sewer Board,* 278 Ala. 213, 177 So.2d 320 (1965) ]; Ala. Code tit. 7A, § 2–718 (1966 Recomp.). As long as the owner's own delay is not incurred in bad faith, it is not unjust to allow proportional fault to govern recovery. Generally, owners do not benefit from delays that they incur. Another reason cited in support of the rule is that proving apportionment is simply too difficult. We do not disagree with the difficulty of the task, but recovery should not be barred in every case by a rule of law that precludes examination of the evidence.

*Id.* (footnotes omitted).

The status of the rule against apportionment in the United States Court of Appeals for the Federal Circuit is unsettled. In *Acme Process Equipment v. United States,* 171 Ct.Cl. 324, 347 F.2d at 535, the Court of Claims stated and followed the rule against apportionment. In *Sauer Inc. v. Danzig,* 224 F.3d at 1347, decided after *Acme Process Equipment,* however, the Federal Circuit upheld a decision from the Armed Services Board of Contract Appeals apportioning delay for the purpose of assessing liquidated damages. *Sauer* involved a contract for the construction of the interior of a building at a submarine base. *Id.* at 1341. During performance of the contract by the plaintiff, Sauer Inc., another contractor was installing cranes inside of the building. *Id.* at 1342. In addition, during performance of part of the contract, the Navy stored a large crane in the building. *Id.* at 1343. Sauer did not complete the contract on time and the government assessed liquidated damages for nine days. *Id.* Sauer filed an appeal with the ASBCA seeking damages due to government caused delay and disruption and the remission of the liquidated damages assessed by the government. *Id.* Both Sauer and the government presented critical-path-management experts. *Id.* at 1344. Each party argued that the other party was responsible for at least a portion of the delay. The Board found that Sauer only was entitled to an additional contract extension of two days, due to the storage of the large crane during the performance of the contract. *Id.* Conse-

quently, the board granted a "commensurate remission of liquidated damages." *Id.*

At the United States Court of Appeals for the Federal Circuit, Sauer argued that the Board should have recognized a longer period of delay and, thus, should have remitted a larger portion of the liquidated damages. *Id.* at 1347. The Federal Circuit rejected the contractor's argument, stating:

> As a general rule, a party asserting that liquidated damages were improperly assessed bears the burden of showing the extent of the excusable delay to which it is entitled. *See Dean Constr. Co. v. United States,* 188 Ct.Cl. 62, 411 F.2d 1238, 1240–41 (1969) (affirming a Board finding that a contractor had failed to meet its burden); *Northern Va. Elec. Co. v. United States,* 230 Ct. Cl. 722, 723 (1982); *Central Ohio Bldg. Co.,* PSBCA No. 2742, 92–1 B.C.A. (CCH) ¶ 24,399, at 121,824, 1991 WL 187546 (Aug. 30, 1991). We have affirmed the Board's finding that Sauer proved only two days of excusable delay. As a result, Sauer has not shown that it is entitled to a remission of liquidated damages greater than the remission already granted by the Board.

> Sauer cites two of this court's cases for the proposition that it was the Navy's burden to establish that Sauer was responsible for the delay in performance, but those cases are inapposite. In both *William F. Klingensmith, Inc. v. United States,* 731 F.2d 805 (Fed.Cir.1984), and *Blinderman Construction Co. v. United States,* 695 F.2d 552 (Fed.Cir.1982), the government's fault for delays had been established, and the court applied the rule that "[w]here both parties contribute to a delay neither can recover damage, unless there is in the proof a clear apportionment of the delay and the expense attributable to each party." *Coath & Goss, Inc. v. United States,* 101 Ct.Cl. 702, 714–15, 1944 WL 3694 (1944); *see Klingensmith,* 731 F.2d at 809; *Blinderman,* 695 F.2d at 559. In this case, the Board found that Sauer failed to show more than two days of government-caused delay; those cases are therefore inapplicable.

*Id.* Thus, unlike the rule against apportionment, which would annul a liquidated damages provision in a concurrent delay situation, *Sauer* awarded the government liquidated damages for delay, even though delay by the government had been found on the contract. *Id.* The rule espoused in *Sauer*, however, would only apportion damages when there "is in the proof a clear apportionment of the delay and the expense attributable to each party." *Id.* (quoting *Coath & Goss, Inc. v. United States,* 101 Ct.Cl. at 714–15).

Regardless of the apparent discrepancy between the rule against apportionment, as described in *Acme Process Equipment,* and the clear apportionment rule, described in *Sauer,* the two rules have coexisted in the United States Court of Claims, the United States Claims Court, and the United States Court of Federal Claims, as well as the United States Court of Appeals for the Federal Circuit, for many years. The rule against apportionment was adopted by the Court of Claims in 1940 in the case of *Schmoll v. United States,* 91 Ct.Cl. 1, 28, 1940 WL 4133 (1940), which based its ruling on an even earlier United States Supreme Court case, *United States v. United Engineering & Constructing Co.,* 234 U.S. 236, 242, 49 Ct.Cl. 689, 34 S.Ct. 843, 58 L.Ed. 1294 (1914). The "clear apportionment" rule cited by *Sauer* dates back to *Coath & Goss, Inc. v. United States,* 101 Ct.Cl. 702, 714–15, 1944 WL 3694 (1944). Prior to *Sauer,* however, the clear apportionment rule generally was applied to situations in which the contractor was attempting to recover for delays for which it was not responsible, not to situations in which the government was seeking to recover liquidated damages. *See, e.g., William F. Klingensmith, Inc. v. United States,* 731 F.2d at 805; *Blinderman Constr. Co. v. United States,* 695 F.2d at 553; *Coath & Goss, Inc. v. United States,* 101 Ct.Cl. at 714.

In considering whether *Sauer* overruled *Acme Process Equipment,* replacing the rule against apportionment with the clear apportionment rule in the liquidated damages context, the court notes that opinions from the United States Court of Claims serve as binding precedent until overturned by the United States Court of Appeals for the Federal Circuit, en banc, the United States Supreme Court, or intervening statutory change. *See Bankers Trust N.Y. Corp. v. United States,* 225 F.3d 1368, 1373 (Fed.Cir.) (citing *South Corp. v. United States,* 690 F.2d 1368, 1370–71 (Fed.Cir.1982)), *reh'g and reh'g en banc denied* (2000); *Middleton v. Dep't of Defense,* 185 F.3d 1374, 1379 n. 2 (Fed.Cir.1999). *Sauer* was a ruling from a three judge panel, not the Federal Circuit en banc. Thus, the rule against apportionment would appear to remain viable in the Federal Circuit. Moreover, there is insufficient proof to find that *Sauer* clearly overruled *Acme Process Equipment* because the court in *Sauer* did not include a discussion of the rule against apportionment, nor cite to any of the cases discussing the rule. *Sauer Inc. v. Danzig,* 224 F.3d at 1347.

■ In the case currently before the court, it is not necessary, however, for the court to select between the rule against apportionment and the clear apportionment rule because, under an analysis of either rule, the government is not entitled to liquidated damages. First, under the rule against apportionment, the court must annul the liquidated damages clause of the contract and reject defendant's claim for liquidated damages because there was evidence of delay by the government on the contract, to which the government admitted. As noted by the court in its opinion following the trial in this case, the defendant summarized its position in its post-trial brief in this action as follows:

> We do not dispute that the pre-design subsurface investigation did not permit Reclamation to depict the actual subsurface rock conditions with absolute precision, that the design process was not without error, that the contract drawings were imperfect, that the project involved a number of changes and redesigns during contract performance (captured in 144 contract modifications), that the Government responded to a significant number of RFIs during the job, that the Government's response to RFIs was [not] as fast as PCL requested in every instance, and that PCL's contract completion was delayed, to

some extent, by Government-directed changes.

*PCL Constr. Servs., Inc., v. United States,* 47 Fed.Cl. at 752. The defendant argued, and the court agreed, that none of those situations rose to the level of a cardinal change or any other breach. *Id.* at 752, 812. Nevertheless, the defendant clearly conceded, and, throughout the trial, did not deny, that it caused some of the delay on the project. *Id.* at 752. In its opinion following the trial, the court found that "[t]he expert reports and the fact witnesses did demonstrate to the court that there was some hindrance by the government, but also that there was culpability for delay on the part of PCL." *Id.* at 802.

Most strikingly, at the trial, the defendant's schedule expert determined and established that the government contributed to the delay of both the Parking Structure and the Visitor's Center. With regard to the Parking Structure, defendant's expert found, for example, that government changes contributed to the delay in commencing work on the Level 3A foundations, delay in commencing work on the Level 3A Beams and Slabs, delay in commencing work on the Level 4A Beams and Slabs, delay in commencing work on the Level 4A Columns and Walls, delay in commencing work on the Level 5A Beams and Slabs, delay in commencing work on the Level 2 Columns and Walls, delay in commencing work on the Level 4 Beams and Slabs, delay in commencing work on the Level 4 Columns and Walls, and delay in commencing work on the Level 5 Beams and Slabs. With regard to the Visitor Center, for example, the defendant's expert found that government changes contributed to the delay in commencing work on the excavation of the Theater Level Plaza of the Visitor Center, delay in commencing work on the construction of Shaft B, delay in commencing work on the Theater Level concrete, delay in commencing work on the V-cut structural steel, delay in commencing work on the framing and drywall of the Visitor Center, and delay in the completion of framing, drywall, electrical and architectural finishes on the theater level of the Visitor Center.

Another example of the delays by the government with regard to the Parking Struc-

ture is the problem encountered in the excavation of the backslope, which led to the delay in commencing work on the Level 3A foundation. During the parking structure backslope excavation, PCL found that the backslope could not be excavated at a stable one quarter to one slope, as required by the contract, because the material would not hold a slope of that angle. *Id.* at 758. Initially, the government directed PCL to excavate the slope to the "natural angle of repose of the existing material." *Id.* After PCL requested a clarification of the term "natural angle of repose," the government supplemented its initial response and directed PCL to excavate the backslope area to a slope of three to one, or until they encountered rock, whichever came first. *Id.* PCL considered the additional work with regard to the backslope to be a change in the contract and submitted direct cost proposals for the backslope change. *Id.* at 758–59. PCL and the government executed Modification 54 to the contract for the direct costs associated with the backslope change. *Id.* at 759. PCL's proposal which led to Modification 54 did not include a time impact evaluation, although PCL reserved the right to submit such an evaluation at a later time. *Id.* According to the defendant's expert report, the problems with the backslope delayed the start of work on the Level 3A Foundations.

In its post-trial opinion, the court found that PCL's own delays and difficulties in its excavation operations contributed to the delay involving the backslope and, thus, that the government's actions with regard to the backslope did not amount to a breach of contract. *Id.* at 804. PCL did not submit a claim for delay with regard to the backslope. *Id.* at 800. The government's own expert report, however, conceded "that the backslope was in fact a delay event on the as-built critical path."

The evidence also showed that the government contributed to delay with regard to the Level 2A/3A Transition Area and Footings. At the trial, PCL identified thirteen column footings on Level 3A, out of fifty, which required changes. *Id.* at 762. Although PCL claimed that the changes resulted in a "major change," only one-quarter of the foot-

ings at Level 3A required changes. *Id.* The changes were the result of differing site conditions. *Id.* PCL notified the government of the site conditions at the Level 3A footing on May 29, 1992.

In a letter dated July 8, 1992, the government issued a letter to PCL with revised drawings for the "construction of the transitions from framed floor to slab-on-grade at level 3A of the parking structure." The letter stated: "The Government considers that this drawing involves a change in the work which will require an adjustment under the contract." In a letter dated January 15, 1993, the government issued a letter to PCL which enclosed further revisions of the slab transition drawings and the Level 3A foundation. The letter stated: "The Government considers that these drawings involve a change in the work which will require an adjustment under the contract." The government's expert found that the delay in the government's delivery of the revised drawings contributed to the delay of the completion of the Level 2A and 3A foundation and the commencement of work on the Level 3A Beams and Slab.

Although the court has found that the government did not delay the construction of the project to the extent plaintiff claims, and, therefore, did not breach the contract, based on the evidence adduced at trial, it is clear that the government did contribute to the delay. Throughout the litigation of this case, defendant has conceded that the government was responsible for at least a portion of the delay in contract performance that occurred in the construction of the Parking Structure and Visitor Center. In addition, the defendant's expert testified that the government contributed to the delay on the project. Finally, the evidence presented at trial, and discussed in the court's September 20, 2000 post-trial opinion, presented specific incidents in which the government delayed the construction of the project. Under the rule against apportionment, as described in *Acme Process Equipment,* the court, therefore, should not attempt to apportion damages in this situation. Instead, the government's actions result in the annulment of the liquidated damages provision of the contract.

Even if the court were to forego the rule against apportionment, however, in favor of the clear apportionment rule, as described in *Sauer,* the court also would reject defendant's claim for liquidated damages because, based on the trial record, including testimony and exhibits before the court, it is impossible to apportion damages in this case due to the nature of the plaintiff's claims and the evidence submitted, or not submitted, by the parties. In determining whether there is a clear apportionment of delay it is useful to recall some of the basic rules on the proof regarding delay. As was stated in the court's September, 2000 opinion, one established way to document delay is through the use of Critical Path Method (CPM) schedules and an analysis of the effects, if any, of government-caused events upon the critical path of the project. However, in order to properly demonstrate delay to a project, the CPM schedule must be kept current to reflect any delays as they occur. *Fortec Constructors v. United States,* 8 Cl.Ct. at 505. "The required nexus between the government delay and a contractor's failure to complete performance at some unspecified earlier date cannot be shown merely by hypothetical, after-the-fact projection." *Interstate Gen. Gov't Contractors, Inc. v. West,* 12 F.3d 1053, 1060 (Fed.Cir.1993). Part of one's understanding that an activity belongs on the critical path of a project is also an understanding of how that activity affects the other activities. *Wilner v. United States,* 26 Cl.Ct. 260, 262–63 (1992), *rev'd on other grounds,* 24 F.3d 1397 (Fed.Cir.1994) (en banc); *see also Mega Constr. Co. v. United States,* 29 Fed.Cl. 396, 424 (1993). "A general statement that disruption or impact occurred, absent any showing through use of updated CPM schedules, logs or credible and specific data or testimony, will not suffice to meet the plaintiff's burden." *Preston–Brady, Co.,* V.A.B.C.A. Nos. 1892, 1991, 2555, 87–1 B.C.A. (CCH) ¶ 19,649 at 99,520, 1987 WL 41248 (1987).

Neither party has submitted evidence which relates, with sufficient credibility, how the changes and delays affected other activities on the project and, thus, would allow the court to clearly apportion the delay present

in the case. With regard to the plaintiff's proof, as was discussed in the court's post-trial opinion:

In its certified claim, PCL made no explicit claim for delay in light of its request for a total cost recovery and its assignment of blame for all of its delays to USBR. PCL, therefore, did not show a cause and effect relationship between USBR's contract changes and PCL's increased costs.

\* \* \* \* \* \*

In short, PCL's hindrance/delay claim is presented as a total cost claim. PCL has not presented an analysis to demonstrate that delays it encountered were due to government hindrance or that, in fact, such hindrance extended project completion, because PCL apparently has not performed and certainly has presented no in-depth critical path analysis.

PCL has never submitted a detailed delay/impact claim to the court. PCL has argued that a delay analysis of this project is either unnecessary, impossible, or not relevant, but that the government caused delays are part of their claims of "severely defective" drawings, cardinal change, hindrance, and breach of contract.

\* \* \* \* \* \*

PCL never provided USBR or this court with a critical path analysis of the alleged government-caused hindrance and its effect upon the critical path of this project. Indeed, PCL appears never to have prepared and certainly never to have offered, a legitimate critical path analysis, and has even chose to reject and to ignore the "summary-level delay analysis" by Petersen Consulting that it did have prepared.

*PCL Constr. Servs., Inc. v. United States*, 47 Fed.Cl. at 800–02. With respect to liquidated damages, plaintiff attempts to rely on the "summary level as-planned and as-built retrospective analysis" (SLSA) which was prepared by Peterson Consulting for plaintiff, but which plaintiff chose not to submit at the trial, and which was rejected as incorrect by James Bennet, president of PCL Enterprises, during his testimony at the trial. The Peterson SLSA, however, was introduced at trial by the government. In its analysis, the Peterson SLSA stated:

Utilizing the adjusted as-planned schedule as the baseline for our analysis, summary roll-up activities were developed which represent an adjusted as-planned critical path sequence of work for both the Visitor Center and the Parking Structure. Actual dates were obtained from the project records for these summary level roll-up activities and a comparison was made to the adjusted as-planned schedule resulting in the identification of delayed start and extended duration variances.

The Peterson SLSA found that the government was responsible for 18.8 months of project delay, leaving three months of unconceded project delays attributable to PCL. Furthermore, the Peterson SLSA concluded that the three months of PCL "unconceded" project delay was concurrent with the government caused delay and was therefore determined to be a period of "non-compensable, excusable delays."

Although the government submitted the Peterson SLSA into evidence, it also presented sufficient evidence to attack its credibility. First, although plaintiff's schedule expert, Joseph Kellogg, was an advisor in the preparation of the Peterson SLSA, Mr. Kellogg chose not to rely on the Peterson SLSA in discussing the government's hindrances relative to the plaintiff's breach of contract claim. It appears that Mr. Kellogg did not trust the report, prepared by his company with his advice. Moreover, Mr. Kellogg testified that during preparation of the Peterson SLSA, several key documents were either missing or overlooked which could have influenced the conclusion of the report. Moreover, the report was prepared by a Martin Jenkins, who was not called as a witness at trial, and whose competence was not presented to the court or subjected to cross-examination. Finally, James Bennet, President of PCL Enterprises during the time of contract performance, who himself was a civil engineer and, according to PCL, "since 1959, has had broad, in-depth experience constructing all types of structures," testified that with regard to the SLSA, "it's obvious that Peterson is wrong." Therefore, the court finds that it

is unable to rely on the Peterson SLSA for a clear apportionment of delay.

The defendant's expert report likewise is insufficient to show a clear apportionment of delay. The defendant's expert report, produced by Thomas Caruso, compared the contractor's as-planned schedule to the as-built schedule in order to identify and quantify delays. Mr. Caruso offered an opinion that the government was responsible for almost sixteen percent of the extended performance period. In the opinion issued September 20, 2000, the court characterized the report, and the testimony of Mr. Caruso, who created the report, as follows:

> Although Mr. Caruso's testimony was considered sufficient to rebut the plaintiff's allegations of hindrance to the extent of breach of contract, the specifics as to the amount of delay were not embraced in total by the court based on the testimony and evidence offered. Nor does the court need to reach such a conclusion for the purposes of this opinion.

*PCL Constr. Servs., Inc. v. United States,* 47 Fed.Cl. at 802. The court continued, in a footnote:

> The court does note that the significance of Mr. Caruso's report was its ability to cohesively tie together events in a manner that rebutted the plaintiff's case. There were flaws in the report that were demonstrated by the plaintiff, yet, there was ample evidence presented to suggest PCL had not suffered a delay or hindrance to the extent of a breach of contract at the hands of USBR. This conclusion was also established by the other USBR, and even PCL, fact witnesses in the case who were present on the site during construction. In other words, the testimony at trial of fact witnesses buttressed the analysis and conclusions of the defendant's expert report; however, the absolute conclusions are not adopted by the court and are reserved for any claim that PCL may elect to bring for a delay claim.

*Id.* at 756 n. 48.

After further consideration, including additional review of the exhibits and testimony offered at trial, the court believes that Mr. Caruso's report, while sufficient to form the basis for rejecting plaintiff's breach of contract claim, does not provide sufficient evidence for a clear apportionment of the delays which occurred during performance of the contract. Mr. Caruso's report fails to analyze exactly how many days of delay were caused by the Bureau, how many were caused by PCL, and how many days were concurrent. According to Mr. Caruso's expert report, the analysis was performed by assuming that "[i]f a Government change could not be identified which affected the start of completion of a critical work, then the remaining delay duration would be attributable to PCL." Thus, Mr. Caruso's report was based on the assumption that there was no disruption by the government on the contract unrelated to an actual change, and all disputed disruptions should be attributed to the contractor. This is contrary to the court's opinion issued September 20, 2000, which found that while the government did not hinder the performance of the contract to the extent suggested by PCL, "[t]he expert reports and the fact witnesses did demonstrate to the court that there was some hindrance by the government" on the contract. *Id.* at 802. The assumption that disruption by the government did not occur on the project is also contrary to project documents, which Mr. Caruso acknowledged on cross-examination. Mr. Caruso admitted that there were some entries in daily reports, both by the government and PCL, that the project was being delayed or "impacted." These reports, however, did not result in a corresponding change to the contract. Thus, by focusing only on government directed change work, Mr. Caruso failed to consider the delay attributable to the government related to disruption and, thus, failed to clearly apportion all of the delay on the contract.

The court's opinion issued on September 20, 2000 describes the atmosphere and general conditions which led to the delays described in the September 20, 2000 opinion. First, the court noted that "[t]hroughout the course of trial, it became evident that the site was complex and difficult for both design and construction purposes." *Id.* at 754. The court also found at the trial that delays often

ensued following the identification and causation of problems by both parties. *Id.* at 776.

It was only after PCL had completed a substantial part of the contractual process and had to substantiate any delay or impact costs related to the changes already the subject of the bilateral contract modifications, that PCL chose to abandon [the process set up by the parties to resolve individual claims] and instead pursued a breach of contract claim.

*Id.* at 787. While the court found that the project completion was delayed and that redesigns did occur, it was not sufficient to prove a breach of contract. Because of the nature of the plaintiff's claim, the complexities of the contract and the proof adduced at trial by both parties, including the expert reports, the court finds that, based on the record, there can be no clear apportionment of the delay on the contract. Therefore, defendant is not entitled to the liquidated damages claimed, under either the clear apportionment rule, or, as discussed above, under the rule against apportionment.

## II. Uncompleted Work

Plaintiff asserts that it is entitled to all amounts retained by the Bureau for warranty, credit and incomplete punch-list items. The United States Court of Appeals for the Federal Circuit has held that the government has "considerable leeway" with regard to administration of its contracts, including retention of contract payments based on contractual provisions. *See Fireman's Fund Ins. Co. v. United States*, 909 F.2d 495, 498 (Fed. Cir.), *reh'g denied* (1990). The retainage clause of the contract at issue states:

When the work is substantially complete, the Contracting Officer may retain from previously withheld funds and further progress payments that amount the Contracting Officer considers adequate for protection of the Government and shall release to the Contractor all the remaining withheld funds. Also, on completion and acceptance of each separate building, public work, or other division of the contract, for which the price is stated separately in the contract, payment shall be made for the completed work without retention of a percentage.

■ In deducting from a contractor's earnings, the government carries the burden of proof to show that its actions were correct. *Southland Enterps., Inc. v. United States*, 24 Cl.Ct. 596, 598 (1991) (citing *Martin J. Simko Constr., Inc. v. United States*, 11 Cl.Ct. 257 (1986), *vacated in part*, 852 F.2d 540 (Fed.Cir.1988)). As the United States Court of Claims stated:

[T]he Government has the burden of proving how much of a downward adjustment in price should be made.... Just as the contractor has that task when an upward adjustment is sought under the Changes clause, so the defendant has the laboring oar, and bears the risk of failure of proof, when a decrease is at issue.

*Nager Elec. Co. v. United States*, 194 Ct.Cl. 835, 853, 442 F.2d 936, 946 (1971).

■ While the defendant has introduced into evidence numerous punch-list items and additional evidence of remaining work the government asserts PCL failed to perform prior to leaving the contract site, the government has never assigned costs to those items. In its supplemental brief, defendant states:

Although we acknowledge that no specific breakdown of costs for PCL's uncompleted work was presented at trial, the simple fact is that items such as failure to provide operation and maintenance manuals, poor concrete finishing work, and incomplete punch list items are difficult to price as discrete items and Reclamation has not assigned specific values to each of the uncompleted items.

At oral argument on the liquidated damages and retainage issues, the court commented that the September 20, 2000 opinion did not find a resultant cost of not having completed the work on the project. The defendant acknowledged that, "[n]o, you didn't, and, frankly, I think I've been about as candid as I can be in our briefing, we didn't give it to you. There is no evidence." Because the defendant has failed to provide any basis for the amount of retainage, the court finds that the defendant has failed to meet its burden of proof on this issue. There can be no downward adjustment of the contract price by the government when there

is no basis on which to calculate the adjustment. The court finds that the plaintiff is entitled to the amounts retained by the government for the failure to complete work on the project.

## CONCLUSION

For the foregoing reasons, the court finds that the plaintiff is entitled to all monies retained by the government. With regard to liquidated damages, under the rule against apportionment, the government's delay of the project results in the annulment of the liquidated damages provisions. In the alternative, under the clear apportionment rule, the court likewise denies the government's assessment of liquidated damages because no clear apportionment of the delay that occurred on the project has been established in the record. With regard to the amounts retained by the government for any failure by the contractor to complete work on the contract, the government has not provided any basis for the amount of the adjustment and, therefore, the defendant has failed to meet its burden of proof in this regard. The final issue remaining in these cases is the defendant's counterclaim on the turntable issue, which the parties have indicated is close to settlement. Upon conclusion of those settlement efforts on the turntable issue, if those efforts are successful, judgment will be entered in both of the above numbered cases.

**IT IS SO ORDERED.**