ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- )<br><br>CKC Systems, Inc. )<br><br>Under Contract No. SPRPA1-12-C-W059 ) | ASBCA No. 60977 |

APPEARANCE FOR THE APPELLANT:    Ms. Jenny Cheng
    President

APPEARANCES FOR THE GOVERNMENT:    Daniel K. Poling, Esq.
    DLA Chief Trial Attorney
    Edward R. Murray, Esq.
    Trial Attorney
    DLA Aviation
    Richmond, VA

    Sharif T. Dawson, Esq.
    Trial Attorney
    Defense Supply Center
    Philadelphia, PA

## OPINION BY ADMINISTRATIVE JUDGE OSTERHOUT

This appeal arises from a contracting officer's (CO's) termination for default of a contract for storage containers for helicopter main rotor blades (blade boxes) between CKC Systems, Inc., (CKC or appellant) and the Defense Logistics Agency (DLA or government). CKC alleges that the government caused CKC's delay due to a change in the scope of the contract by requiring wooden skids in the container to have a stamp on them in a visible location when the container is used at a warehouse. CKC requests that the termination for default be converted to a termination for convenience because of this alleged excused delay. The government argues that the stamp markings were always required as part of the contract and that CKC failed to deliver on time. The parties have elected to waive a hearing and submit the case upon the record pursuant to Board Rule 11. We deny the appeal.

## FINDINGS OF FACT

1. On July 12, 2012, DLA issued contract number SPRPA1-12-C-W059 (the contract) to CKC to produce 38 shipping and storage containers for main rotor blades for the UH-1 and AH-1Z helicopters, under National Stock Number (NSN) 8145-01-563-8433

at contract line item number (CLIN) 0001AA. The amount of the contract was $174,347.04. (R4, tab 1)

2. The contract contained a requirement for a first article test at CLIN 0001AB, which was not separately priced (R4, tab 1 at 2).

3. The contract allowed for early and incremental deliveries (R4, tab 1 at 2).

4. The contract required delivery of the first article within 60 calendar days of the issuance of the contract (R4, tab 1 at 6). Thus, delivery of the first article was due on September 10, 2012.

5. The contract required delivery of 38 containers by February 5, 2014 (R4, tab 1 at 2).

6. The contract award document stated that the contract consisted of CKC's proposal, solicitation number SPRPA1-12-R-W308 (the solicitation), and "this award/contract" (R4, tab 1 at 1, block 18).

7. The first sentence of the "Scope" section of the solicitation directed offerors, "Should a conflict arise between the drawings the contract contact code 0771.17 and the contracting officer for resolution." The "Scope" section of the solicitation also stated, "Articles to be furnished hereunder shall be manufactured, tested and inspected in accordance with <Container Research Corporation> drawing number (<05259>) <775E001>, Revision <latest> and all details and specifications referenced therein." (R4, tab 11 at 5)

8. Paragraph 1.7 of the solicitation stated, "[w]hen discrepancies exist between these requirements and those on current manufacturer's drawings, these requirements shall prevail" (R4, tab 11 at 5).

9. Amendment No. 0001 of the solicitation, issued May 9, 2012, directed offerors to the applicable drawings, which included drawing 775E002 (R4, tab 12 at 1, 3). Drawing 775E002 referred to the wooden skids as items 17 and 18 (R4, tab 37 at 15). Note 1 on the overview drawing in 775E002 stated, "Items 17 & 18 to be manufactured, treated, and identified in compliance with *ISPM No. 15*" (R4, tab 37 at 8).

10. The solicitation included NAVSUP WSSDA07, PRESERVATION, PACKING AND MARKING (JAN 2012) (R4, tab 11 at 7). Paragraph 5 of NAVSUP WSSDA07 included directions concerning wood packaging material. It directed offerors that the International Standards for Phytosanitary Measures (ISPM) 15 "Guidelines for Regulating Wood Packaging Material in International Trade" applied. Specifically, it required ISPM 15 for all Wood Packaging Material (WPM) and:

2

WPM is defined as wood pallets, *skids*, load boards, pallet collars, wooden boxes, reels, dunnage, crates, frames, and cleats. *Packaging materials exempt from the requirements are materials that have undergone a manufacturing process such as corrugated fiberboard, plywood, particleboard, veneer, and oriented strand board.* All WPM shall be constructed from Heat Treated (HT to 56 degrees Centigrade for 30 minutes) lumber and certified by an accredited agency recognized by the ALSC in accordance with Wood Packaging Material Policy and Wood Packaging Material Enforcement Regulations (http://www.alsc.org). *All materials must include certification markings in accordance with ALSC standards and be placed in an unobstructed area that will be readily visible to inspectors.* Pallet markings shall be applied to the stringer or block on diagonally opposite sides and ends of the pallet and be contrasting and clearly visible. All dunnage used in configuring and/or securing the load shall also comply with ISPM 15 and be marked with an ALSC approved DUNNAGE stamp. Failure to comply with the requirements of this restriction may result in refusal, destruction, or treatment of materials at the point of entry, possibly causing unacceptable delay in delivery of needed parts.

(R4, tab 11 at 9) (emphasis added)

11. ISPM 15 is entitled "Regulation of Wood Packaging Material in International Trade." The scope of the regulation states:

This standard describes phytosanitary measures that reduce the risk of introduction and spread of quarantine pests associated with the movement in international trade of wood packaging material made from raw wood. Wood packaging material covered by this standard includes dunnage but excludes wood packaging made from wood processed in such a way that it is free from pests (e.g., plywood).

(R4, tab 38 at 5)

12. Paragraph 2.1 of ISPM 15 contains a list of exemptions, including "wood components permanently attached to freight vehicles and containers" (R4, tab 38 at 7).

13. The contract incorporated by reference Federal Acquisition Regulation (FAR) 52.249-8, DEFAULT (FIXED-PRICE SUPPLY AND SERVICE) (APR 1984), which states:

> (a)(1) The Government may, subject to paragraphs (c) and (d) below, by written notice of default to the Contractor, terminate this contract in whole or in part if the Contractor fails to –
>
> (i) Deliver the supplies or to perform the services within the time specified in this contract or any extension;
>
> (ii) Make progress, so as to endanger performance of this contract (but see subparagraph (a)(2) below); or
>
> (iii) Perform any of the other provisions of this contract (but see subparagraph (a)(2) below).
>
> (2) The Government's right to terminate this contract under subdivisions (1)(ii) and (1)(iii) above, may be exercised if the Contractor does not cure such failure within 10 days (or more if authorized in writing by the Contracting Officer) after receipt of the notice from the Contracting Officer specifying the failure.

(R4, tab 1 at 13)

14. In January 2014, the government released the first article test report, concluding that the container met the requirements. While testing was conducted on June 6, 2013, the record does not demonstrate when CKC delivered the first article for testing. The report detailed dents and other potential issues with the blade boxes but did not include a comprehensive list of what CKC did right to comply with the contract. There was no mention of markings on the hardwood portion of the skids and no photographs demonstrated whether the hardwood was appropriately labeled or not. (R4, tab 16) Only one photograph showed the wooden portion of the skids, but it was only part of the wooden portion so markings may have been visible in the part that was not in the photograph (R4, tab 16 at 7). Thus, nothing in the record demonstrated whether the skids were marked during the first article test or not.

4

15. On July 23, 2015, the government issued unilateral Modification No. P00001. The modification was "to provide a revised delivery date of October 30, 2015 due to mutual delay." The modification stated that the first article test was "granted" in September 2014. The modification also included directions that earlier deliveries were acceptable and that "[a]ll other terms and conditions remain the same." (R4, tab 2 at 1-2)

16. On November 19, 2015, the government appeared to issue unilateral Modification No. P00002. The modification in the record is unsigned.[1] This modification extended the delivery date to December 1, 2015. (R4, tab 3)

17. On December 1, 2015, the contract specialist emailed CKC. The contract specialist inquired as to whether items had been shipped or if the contract was still open. The contract specialist also requested that CKC submit a final invoice if delivery had been made. (R4, tab 17)

18. Also on December 1, 2015, CKC responded, "W059 is still an open contract. We are close to completing them and will ship them in less than 6 months." (R4, tab 17)

19. By letter dated December 3, 2015, the CO sent CKC a show cause letter for the contract. The CO summarized the contract award and delivery date modifications. The CO stated that the government was considering terminating the contract for default. The CO stated:

> Pending a final decision in this matter, it will be necessary to determine whether your failure to perform arose from causes beyond your control and without fault or negligence on your part. Accordingly, you are given the opportunity to present, in writing, any facts bearing on the question to [the contract specialist], within 10 days after receipt of this notice. Your failure to present any excuses within this time may be considered as an admission that none exist.

(R4, tab 18)

20. On December 14, 2015, CKC responded to the show cause letter. CKC stated, "[t]he subject had [first article test] requirement and Government took an extended 15 months to approve the [first article] due to various reasons." CKC also

---

[1] CKC did not dispute that this unsigned modification and all of the other unsigned modifications were part of the contract. Therefore, we accept these modifications as part of the contract but note which ones were unsigned in each fact.

requested an extension until June 29, 2016, which appeared to be an administrative error that should have been 2017. CKC stated four reasons it was late:

> 1. Contingencies that were out of our control.
>
> 2. Delay was caused by our allocation of resources to fulfill other Government urgent need and so compromises this schedule.
>
> 3. 80% materials are in-house and remaining is promised within 45 days.
>
> 4. CKC is planning to assemble the units once completed fabrications.

(R4, tab 19) CKC promised to provide a spreadsheet with revised delivery schedules for this contract and other contracts that had received show cause notices on December 16, 2015.

21. On December 16, 2015, CKC provided a spreadsheet of when it anticipated completing the contracts in which it was behind schedule. CKC requested that the government extend the delivery date for the blade boxes to 19 delivered by February 2016 and 19 delivered by April 2016. (R4, tab 20)

22. On December 22, 2015, the CO sent CKC a letter which notified CKC that the government would accept a delivery date of June 29, 2016, in exchange for a reduction of $1,748.00 in the contract price (R4, tab 21).

23. On December 22, 2015, the government appeared to issue unilateral Modification No. P00003. The modification in the record is unsigned. This modification stated that it was issued in accordance with CKC's correspondence, dated December 18, 2015, to set forth a new delivery schedule with consideration of reduced contract pricing for CLIN 0001AA. The new delivery date was June 29, 2016. The unit price was reduced by $46.00 to $4,542.08 for a reduction of $1,748.00. The total price changed from $174,347.00 to $172,599.04. The modification also stated, "All other terms and conditions will remain the same. Earlier delivery will be accepted but will not be considered expedited shipments." (R4, tab 4 at 1-2)

24. On March 28, 2016, the government appeared to issue unilateral Modification No. P00004. The modification in the record is unsigned. This modification updated the delivery address for CLIN 0001AA but did not change any other portions of the contract. (R4, tab 5 at 1-2)

25. On July 7, 2016, the government issued unilateral Modification No. P00005. This modification changed the delivery date for CLIN 0001AA to July 29, 2016. The modification stated, "No consideration is required; the due date is extended due to a delay in the DCMA inspection." (R4, tab 6)

26. On August 9, 2016, the contract specialist sent CKC an email asking whether CKC would accept a no-cost cancellation on the contract. CKC answered that it disagreed and attempted to "paint [] a better picture" of the status of the contract by explaining where each blade box was in the process. CKC asked for another extension, this time for 2 months, stating, "And if you and your team is open, we are willing to offer 1% consideration to extend for just the additional 2 months." (R4, tab 24)

27. On August 17, 2016, the government issued unilateral Modification No. P00006. This modification corrected CLIN 0001AA referenced in Modification Nos. P00004 and P00005 to CLIN 0001AC but all other terms and conditions remained the same. (R4, tab 7)

28. On September 1, 2016, the government issued unilateral Modification No. P00007. This modification modified the delivery schedule for consideration of a reduction in the contract price of $1,748.00 and restructured the CLINs. According to this modification, CLIN 0001AA was canceled in its entirety by Modification No. P00004. CLIN 0001 AB, the first article test, had already been delivered and approved. And CLIN 0001AC for 38 units had been due on July 29, 2016, with a unit price of $4,542.00 each. The new delivery schedule reduced the number of units in CLIN 0001AC to 10, established CLINs 0001AD and 0001AE, and reduced the unit price to $4,496.08 each. Therefore, the modification required 10 units be delivered by October 31, 2016, under CLIN 0001AC, 2016; 14 units delivered by November 30, 2016, under CLIN 0001AD; and 14 units delivered by January 2, 2016, under CLIN 0001AE. (R4, tab 8)

29. On September 14, 2016, after observing non-compliance with the contract during an inspection on September 8, 2016, the government issued Corrective Action Request (CAR), 47 days prior to the delivery date for the first ten units reference number 5BN8120160003, which described problems with the blade boxes and stated, in relevant part, "Container skids, per drawing, Base Assembly 775E002, are required to be hardwood, manufactured, treated and identified per ISPM No. 15." The non-compliance description stated, in relevant part, "Container skids not correct type wood per drawing and not manufactured, treated and marked per ISPM No. 15." A response was required by October 4, 2016. (R4, tab 26 at 1)

30. On October 4, 2016, CKC sent the government a response to the CAR.

Concerning the skids, CKC stated:

> Drawing 775E002-17 & -18 specifies hardwood identified per ISPM No. 15 which exempt these skids (2.1 Exemptions ISPM 15) from this standard. However, all skids are made to size by CKC from the hardwood (Grade # 1 Common by American Hardwood Expert Council, Grade 4 is identified) bearing the stamp required by ISPM No. 15 (indicated heat treated, etc[.]). Photo of stamp on wood can be provided. CKC consider[s] compliance to the drawing requirement for the skids.

(R4, tab 27 at 1, 4)

31. On October 4, 2016, the government issued unilateral Modification No. P00008, which corrected the delivery date for CLIN 0001AE in Modification No. P00007 from January 2, 2016 to January 2, 2017 (R4, tab 9).

32. On October 5, 2016, the government rejected CKC's response to the CAR and requested a new answer by October 12, 2016 (R4, tab 27 at 1).

33. On October 12, 2016, CKC responded to the CAR again. Regarding the skids, CKC stated, "CKC believes that it met the drawing requirement and is seeking clarification from PCO Engineer, may result with RFV. (CKC made skids from upper grade/type hard wood treated per ISPM 15, [(]Grade 4 is lowest grade hard wood; skid is exempt from ISPM No. 15))." (R4, tab 28 at 2)

34. In its undated request for clarification from the engineers, CKC highlighted ISPM 15 exemption 2.1 "The following articles are of sufficiently low risk to be exempted from the provisions of this standard []: [w]ood components permanently attached to freight vehicles and containers." CKC explained, "The skid is permanently attached to the container by four bolts/nuts and so no identification is required per the ISPM No. 15." CKC included photographs for reference. CKC asked if it met the requirements or not and asked for a waiver if it did not meet the requirements. (R4, tab 29)

35. On October 21, 2016, CKC sent the contract specialist an email asking for "some clarification from Engineering Dept. in regards to a wooden skid issue on SPRPA1-12-C-W059." The email references an attachment but the record does not contain an attachment. (R4, tab 30)

36. On October 26, 2016, the contract specialist responded to CKC's email, stating:

> I've received the following in response to your request for clarification: "N241 has reviewed the request. Note 1 states Items 17 & 18 to be Treated and Identified in Compliance with ISPM 15. The specification cited is commercial and the Navy does not recognize the exemptions. The wood skids must have a stamp on them or they will be frustrated once they reach the warehouse (DLA and bonded)"

(R4, tab 30)

37. By letter dated November 7, 2016, the CO sent CKC a show cause letter. The CO stated that CKC had missed the first delivery of 10 units that was due on October 31, 2016, and that 14 units were due on November 30, 2016, and another 14 units were due on January 2, 2016. The CO stated that the government was considering terminating the contract for default. The CO stated:

> Pending a final decision in this matter, it will be necessary to determine whether your failure to perform arose from causes beyond your control and without fault or negligence on your part. Accordingly, you are given the opportunity to present, in writing, any facts bearing on the question to [the contract specialist], within 10 days after receipt of this notice. Your failure to present any excuses within this time may be considered as an admission that none exist.

(R4, tab 31) The CO directed that a reply must be received by November 17, 2016.

38. On November 14, 2016, CKC issued a purchase order to Bentco Pallet & Crate LLC (Bentco) for 100 each "heat treated hardwood (grade 4 min.) per ISPM no 15; 3.62 x 2.62 x 38.50; stamp both ends" and 39 each "heat treat and stamp both ends on hardwood per ISPM no 15" (R4, tab 61).

39. On November 17, 2016, CKC sent a reply to the show cause letter. CKC stated, "During the course of receiving clarification on a 'skid' issue, DLA noted that 'the wood skids must have a stamp on them or they will be frustrated once they reach the warehouse (DLA and bonded)." CKC explained:

> Our wood skids had already been machined prior to this request, so some of the stamped skids had been partially

9

removed during the machining process. Unfortunately, the vendor who supplied the wood no longer existed, so a request for an additional stamp on our existing wood skids was not possible. As a result, CKC had to purchase from a new vendor in addition to the stamping where it will be easily visible, even after completion of the machining the wood. Due to the new vendor, the QAR is also requiring documentation, and we are in the process of satisfying the documentation request.

(R4, tab 32) CKC offered to reduce the contract price by $1,000 for an additional extension. The additional extension would consist of CLIN 0001AC's 10 units due on December 16, 2016; CLIN 0001AD's 14 units due on January 31, 2017; and CLIN 0001AE's 14 units due on February 28, 2017. Nothing in the record demonstrates that CKC included estimates of when the new, heat treated wood might arrive, or that it could meet any of the remaining delivery dates.

40. On November 23, 2016, nine days after receipt of the purchase order, Bentco delivered and CKC received 39 pieces of heat treated wood, stamped US-11-577 (R4, tab 62 at 1) and 100 pieces of hardwood per ISPM 15 stamped US-11-577 (R4, tab 62 at 4). Bentco included certification documents to demonstrate that the hardwood met ISPM 15 standards (R4, tab 62 at 2, 5).

41. On December 7, 2016, the CO sent CKC a letter notifying it that it was terminated for default. The letter stated that this was the contracting officer's final decision and provided appeal rights for the Board. (R4, tab 34)

42. Also on December 7, 2016, CKC responded to the termination letter, requesting that the contract not be terminated because "it would be in the best interest of both parties that this contract be completed by CKC" because 10 units were complete already. CKC explained, "During your review of our Show Cause Response, we had to overcome the stamps issue for all the skids to accommodate the depot's requests." CKC stated that 10 units were ready and a source inspection was scheduled for December 7, 2016, but stopped due to the termination letter. CKC provided a new delivery schedule of delivering: 10 units by December 16, 2016, under CLIN 0001AC; 14 units by January 31, 2017, under CLIN 0001AD; and 14 units by February 28, 2017, under CLIN 0001AE. (R4, tab 35 at 1)

43. Also on December 7, 2016, the government issued unilateral Modification No. P00009. This modification terminated the contract for default. The modification included the standard statement concerning appeal rights. (R4, tab 10)

44. On December 22, 2016, CKC appealed the CO's final decision and the appeal was docketed as ASBCA No. 60977.

45. On February 13, 2018, the CO issued a new final decision, which allowed for payment of 10 units but maintained the termination for default for the remaining 28 units. The CO stated that during discovery conducted as part of the appeal, it became apparent that CKC attempted to deliver the 10 blade boxes referenced in CLIN 0001AC prior to termination of the contract. Thus, the CO decided to pay CKC for the 10 blade boxes for which CKC attempted delivery. The CO stated that "on December 8, 2016, I issued a final decision demanding a return of $100,151 in progress payments pursuant to another contract terminated for default, Contract SPRPA1-12-C-W008." The CO stated that these funds had not yet been returned to the government so the CO reduced the amount owed by $44,960.86, the amount owed to CKC for 10 blade boxes under CLIN 0001AC. This reduced the amount CKC purportedly owed the government to $55,190.14 under contract SPRPA1-12-C-W008, a contract not subject to this appeal. (R4, tab 65 at 1-2)

46. On March 16, 2018, CKC requested the government reconsider the February 2018 final decision and accept the final 28 boxes. CKC stated that it included photographs that demonstrated that it was close to finishing the remaining 28 boxes. The government indicated that it would "stand by the final decision." (R4, tab 67)

## DECISION

The legal standards for a termination for default are well established. Under the default clause, here FAR 52.249-8 DEFAULT (FIXED-PRICE SUPPLY AND SERVICE) (APR 1984), the government may terminate for default by written notice if the contractor fails, without excuse, to: deliver supplies within the time specified or any extension; make progress, as to endanger performance of the contract; or perform any other provisions of the contract. For the latter two categories, the government may exercise its right to terminate if the contractor does not cure the failure within 10 days after receiving notice from the contracting officer that specifies the failure.

Termination for default "is a drastic sanction which should be imposed (or sustained) only for good grounds and on solid evidence." *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987) (quoting *J.D. Hedin Constr. Co. v. United States*, 408 F.2d 424, 431 (Ct. Cl. 1969) (further citations omitted). While CKC appealed the contracting officer's decision, "a termination for default is essentially a government claim." *Thunderstruck Signs*, ASBCA No. 61027, 17-1 BCA ¶ 36,835 at 179,504. Thus, the government maintains the burden of proving that a termination for default was justified, by a preponderance of the evidence. *Id.* (citing *DayDanyon Corp.*, ASBCA No. 57681, 15-1 BCA ¶ 36,073 at 176,151; *Keystone Capital Services*, ASBCA No. 56565, 09-1 BCA ¶ 34,130 at 168,753 (citing *Lisbon Contractors*, 828

F.2d at 765). Should the government establish the prima facie case to justify the termination, "the burden shifts to the contractor to prove the default was excusable." *Truckla Services Inc.*, ASBCA Nos. 57564, 57752, 17-1 BCA ¶ 36,638 at 178,445 (citing *ADT Constr. Grp., Inc.*, ASBCA No. 55358, 13 BCA ¶ 35,307 at 173,312).

Here, the government established a prima facie case to justify the termination for default. After a number of modifications granting CKC extensions, the last delivery schedule the government agreed to was: 10 units be delivered by October 31, 2016, under CLIN 0001AC; 14 units delivered by November 30, 2016, under CLIN 0001AD; and 14 units delivered by January 2, 2017, under CLIN 0001AE (findings 28, 31). When CKC failed to deliver the first ten units by October 31, 2016, the government issued a show cause letter pursuant to the requirements of the FAR and the contract (finding 37). When CKC responded to the show cause letter, it did not state how it would meet the remaining delivery dates but instead provided yet another delayed schedule (finding 39). CKC's first attempt at delivery of the first 10 units under CLIN 0001AC occurred on December 7, 2017 (finding 42). CKC did not attempt delivery of the other units and CLINs. Thus, CKC failed to deliver the units on time and the government established the prima facie case to justify the termination.

The burden then shifts to CKC to demonstrate that its failure to timely deliver was excusable. To establish that CKC is entitled to excusable delay, it must demonstrate that the delay resulted from a cause which was unforeseeable, beyond the control of the contractor, and without fault or negligence by the contractor. *Sauer Inc. v. Danzig*, 224 F.3d 1340, 1345 (Fed. Cir. 2000). CKC argues that its delay is excusable because of changed contract conditions. Specifically, CKC argues that the government imposed a stricter requirement than the contract required because ISPM 15 provided an exemption for "wood components permanently attached to freight vehicles and containers" and the hardwood skids were permanently attached by four bolts and nuts.[2] (Finding 34)

---

[2] In its initial brief, CKC stated, "The first article took government one and half year[s] to approve due to lack of funding and its availability at that time to do the testing. Finally, the first article sample was returned to CKC but badly damaged to a point that it could not be refurnished to become a production unit." (App. br. at ¶ 2) None of this information was contained in CKC's complaint or referenced in the record. Nevertheless, the government extended the contract several times after the first article test was completed so this allegation was resolved with the issuance of further modifications and should not have impacted the rationale for the termination for default (findings 20-23). Further, even if this had impacted CKC's performance, the government accepted CKC's estimates on how long it would take to complete the blade boxes and extended the contract by that amount of time at least three times (findings 20-23, 27-28).

12

Unfortunately for CKC, the requirement for marking the hardwood was contained within the contract; therefore, CKC's own actions of not complying with the contract caused the delay. CKC is correct that the contract directed it to follow the requirements contained in ISPM 15. The drawings and solicitation both required compliance with ISPM 15. (Findings 9-10) However, even if the exemption CKC references in ISPM 15 applied, CKC was responsible for marking the wooden skids because the contract also contained other clauses and directions that require more stringent requirements to mark the hardwood (finding 10)

NAVSUPWSSDA07 was included in the solicitation and provided offerors with directions concerning wood packaging and was incorporated in the contract (finding 10). It directed offerors to comply with ISPM 15 but it provided further details concerning what exceptions were allowed. Specifically, it stated, "Packaging materials exempt from the requirements are materials that have undergone manufacturing process such as corrugated fiberboard, plywood, particle board, veneer, and oriented strand board." Thus, the exceptions were narrower than the exemptions permitted in ISPM 15. (Finding 10) This acquisition does not meet the narrower exceptions contained in the contract because, by CKC's own admission, the contract required hardwood, not the materials excepted by the clause (finding 30).

NAVSUPWSSDA07 also stated, "All materials must include certification markings in accordance with ALSC standards and be placed in an unobstructed area that will be readily visible to inspectors" (finding 10) Thus, the contract required markings.

Further, the solicitation also stated, "When discrepancies exist between these requirements and those on current manufacturer's drawings, these requirements shall prevail" (finding 8). Therefore, the markings on the drawings directing offerors to comply with ISPM 15 do not provide an avenue to rely upon the exemption listed in ISPM 15.

Additionally, it was within CKC's control to fix the issue once it became aware of the requirement to mark the hardwood. The government's CAR concerning the lack of markings on the hardwood was issued on September 14, 2016, which was 47 days prior to the delivery date of the first ten units (finding 29). Instead of ordering wood in compliance with the contract at that time, CKC sent numerous questions to the government about whether the markings were actually required (findings 30, 33-35). CKC issued a purchase order for the new wood on November 14, 2016 (finding 38). That wood was delivered nine days later, on November 23, 2016 (finding 40). CKC had ten units ready for inspection by December 7, 2016 (finding 42), fifteen days after receiving the wood. If CKC had ordered the contract-compliant wood shortly after receiving the CAR, it could have met the October 31, 2016, and subsequent delivery dates.

13

Based on all of these portions of the specifications and drawings, the contract required the markings be placed in an unobstructed area that was readily visible to inspectors. The government did not change the contract. Further, decisions CKC made caused the delay in the contract, once CKC was aware of the noncompliant hardwood markings. Thus, appellant has failed to demonstrate that it is entitled to an excusable delay and the termination for default is justified.

CONCLUSION

The appeal is denied.

Dated: June 20, 2019

HEIDI L. OSTERHOUT
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

JOHN J. THRASHER
Administrative Judge
Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 60977, Appeal of CKC Systems, Inc., rendered in conformance with the Board's Charter.

Dated:

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

14